**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 99-10982

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

REYMUNDO RODRIGUEZ,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Texas,
Fort Worth Division

July 30, 2001

Before SMITH and DENNIS, Circuit Judges, and ROETTGER,[*] District Judge.

DENNIS, Circuit Judge:

Reymundo Rodriguez, a U.S. Postal Service employee, was convicted by a jury of misappropriating postal funds, 18 U.S.C. § 1711, and sentenced to five months imprisonment and two years supervised release. He appealed. We reverse his conviction and sentence. Rodriguez's right to due process was violated when the trial court permitted the prosecutor to argue to the jury that it should infer guilt from Rodriguez's election to remain silent after his arrest and receipt of Miranda warnings.

---

[*] District Judge of the Southern District of Florida, sitting by designation.

Rodriguez, a U.S. Postal Service employee, was assigned to the box line at the Service's Fort Worth General Mail Facility (GMF) on May 19, 1998. Each post office in the district sends its cash proceeds to the GMF in numbered deposit bags that require a safeguarded transfer process ending in a transfer from a box-line employee at the GMF to an armored car guard who then takes the deposit bags to a bank.

According to testimony at Rodriguez's trial, GMF employees processed the money received by the post offices in the following manner: When the numbered deposit bags entered the registry room, a registry clerk and one other employee signed for them, placed them in a green nylon liner along with an inventory list, sealed the liner with a numbered single-use seal, and put the liner in a large hamper. A box-line employee would then sign for the hamper and move it to the box-line area. One employee, the "caller," (usually the same employee who signed for the hamper at the registry room and moved it to the box line) would then break the seal on the liner and call out the numbers on the enclosed deposit bags, which numbers were separately recorded by another box-line employee, the "writer," and the bank's armored car guard, as the caller transferred the deposit bags to a container used by the guard to take the deposits to the bank.

Prior to May 19, there had been four instances when deposit

bags turned in to the GMF were unaccounted for during the transfer process. These losses, totaling $20,206, occurred on February 27, 1998; March 17, 1998; April 21, 1998; and May 5, 1998. Postal inspectors analyzed records identifying the guards, writers, and callers on those days and determined that Rodriguez was the only person common to all of the losses. For each day when a loss was discovered, Rodriguez was the person who signed out the hamper from the registry cage and called out the registered mail numbers.

In reaction to these unexplained losses of deposits, on May 19, 1998, postal inspectors were observing the GMF workroom floor from a catwalk through a one-way glass mirror. During the deposit transfer process on May 19, Rodriguez was working as the caller. Rodriguez broke the seal on the green hamper liner and began taking deposit bags out. As he called out the number on each bag, he placed the bag in the guard's container. However, on two occasions he did not call out the bag number or transfer the bag to the guard's container. Instead, he pushed the two bags under a corner of the hamper liner.

After Rodriguez finished transferring the other deposit bags, he took the hamper liner out of the large hamper and placed it, with the two deposit bags he had not called out, into a smaller utility cart and began wheeling the cart in the opposite direction from the registry room. When a co-worker asked Rodriguez why he removed the liner from the large hamper when the registry clerks preferred to have the liner inside the large hamper, Rodriguez put

3

the liner, with the two concealed deposit bags, back in the large hamper. Instead of going directly to the registry room to turn in the hamper and liner to the registry clerk, Rodriguez continued in the opposite direction, to a door connecting the workroom floor to the GMF's public lobby.

He transferred the liner from the large hamper, which would not fit through the door, into a smaller utility cart and pushed the cart into the lobby. An undercover postal inspector stationed in the lobby observed Rodriguez open Locker 21, one of a group of lockers used to store postal customers' large parcels, and place a deposit bag inside. As Rodriguez picked up the second bag, the inspector left the lobby to notify the other inspectors by radio. When the inspector returned, Rodriguez was gone. The inspector went to Locker 21 and found the key still in the lock. He opened the door and found the two deposit bags.

Rodriguez returned to the work area, took the empty liner from the utility cart, placed it in the large hamper and took that back to the registry room, speaking to no one about what he had just done. He was then called to the workroom door by two inspectors, who had Rodriguez accompany them to Locker 21 where they retrieved the two deposit bags, together containing $5,741. Rodriguez was placed under arrest, handcuffed, read his Miranda rights, and taken to the inspectors' office on the third floor of the GMF. During a seven-minute period, the inspectors told Rodriguez that they had a

4

videotape that showed him stealing deposit bags on the four previous occasions when money had disappeared from the transfer process. Rodriguez expressed his doubt that they had a videotape showing him taking the money involved in the four previous disappearances, saying he had nothing to do with those prior disappearances. He then invoked his Fifth Amendment right to remain silent, and requested a lawyer, saying nothing to the inspectors about his involvement in removing the two deposit bags from the May 19 deposit transfer process. The postal inspectors left the room, and Rodriguez's supervisors entered and offered to allow him to resign, but over the course of a three-minute conversation he declined and said he intended to file a union grievance.

When he filed his union grievance three days following his arrest, Rodriguez submitted a written statement admitting taking the two bags and placing them in Locker 21. However, he denied any intent to steal the money or convert it to his own use. He stated that he diverted the bags to illustrate the lax security in the money transfer process at the GMF, and that he had intended to retrieve the bags and bring them back to the registry room but had been interrupted from this plan by the inspectors.

During the jury trial Rodriguez testified in his own defense.

On direct examination, Rodriguez's defense counsel asked him, "Did you tell [the inspectors] at some point that that was your

5

intention, your intention was to make a point?  Did you tell management, inspectors?"  Rodriguez answered, "Yes.  I gave a statement to postal management."

The prosecutor cross-examined Rodriguez on that subject:

Q:  In that seven-minute time period [while being interrogated by the inspectors], did you ever at any time even one time offer up to the inspectors, hey, this was a security test on my part?

A: Sir, when I went upstairs–

Q: . . . Please answer my question.  Did you ever at that time period raise to the postal inspectors that this was a security test on May 19, 1998?

A: No, sir.

Later in the cross-examination, regarding the time period when he was confronted by management, the prosecutor again questioned Rodriguez about his silence on the security test defense:

Q: And they had come in there and they spent about how long with you, how long until you decided not to resign and left?

A: About three minutes.

Q: Did you at any time during that three-minute discussion with the management representatives of the

6

United States Post Office, did you raise to them one time that what had happened on May 19, 1998, was a security test? Did you do that, sir?

A: No, sir, because they didn't ask me.

Q: Okay. But you know what you're being accused of?

A: Right.

Q: The postal inspectors told you point blank, you're being accused of failing to remit mail to the bank on May 19?

A: You're right.

Q: You knew that when the management people showed up, didn't you?

A: All management asked me was if I was going to resign, and I told them, no, I was going to file a grievance. And filing a grievance was my protest against postal management.

Q: Okay. So in light of the allegations against you made by the inspectors and known by management, you did not stand up and yell from the rooftops that you are accusing an innocent man, did you, sir?

A: No, sir.

Q: You never voiced your innocence to a single person after they picked you up on May 19, 1998, did you, sir?

A: No, sir.

7

Defense counsel did not object to the prosecutor's questioning of Rodriguez regarding Rodriguez's post-arrest silence.

During the prosecutor's closing argument, he addressed Rodriguez's security test defense by arguing, "[T]hat's not what was going on. That's exactly what was not going on. And you know that because he never bothered to mention that until well after the fact. That's when he came up with this so-called security check."

Again, in his rebuttal closing argument, the prosecutor emphasized Rodriguez's post-arrest silence:

> [I]f for some reason on that day Mr. Rodriguez did not have a bad purpose, a wrongful intent in taking those bank bags, you know that in connection with the events that took place there, he would have voiced it to someone. And why did[n't] he voice it to someone, ladies and gentlemen? Because he had the intent to take those bags.

The defense counsel did not object to this comment.

Next, the prosecutor urged the jury to find that Rodriguez did not mention the security test to any co-workers between putting the deposit bags in the locker and his arrest. The defense counsel objected that "it's a comment on his right not to say anything." The court sustained the objection and instructed the jury to

8

disregard any suggestion that Rodriguez did not have a right to remain silent.

The prosecutor, however, continued to dwell upon Rodriguez's post-<u>Miranda</u> warning silence and, in effect, argued that the jury should infer that Rodriguez was guilty of willingly and knowingly failing to remit the deposit bags to the designated depository because he chose to remain silent rather than to inform the postal inspectors that he had taken the proceeds only for the purpose of demonstrating the laxity of Postal Service security measures during the transfer process.

The prosecutor argued:

I submit to you the most important evidence in this case concerning Mr. Rodriguez's intent is when you compare and contrast his testimony on the witness stand . . . with what happened on May 19. And remember what Mr. Rodriguez told you. On May 19, when the inspectors took him upstairs, he did not say to the inspectors, "Hey, this is a security test." He did not say that. And when management came in to talk to him about his job status, he did not say, not one time and not a peep, "This is just a security test."

The defense counsel immediately objected on the basis that the prosecutor's comment constituted an impermissible comment on

9

Rodriguez's right to remain silent. The trial court, without explanation, overruled the objection. Rodriguez moved for acquittal following the return of the jury's guilty verdict, and that motion was denied.

II.

A.

As a general rule, the government may not "impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving Miranda warnings at the time of his arrest." Doyle v. Ohio, 426 U.S. 610, 611 (1976). The Doyle Court concluded that the government violates a defendant's due process rights by commenting on his post-arrest, post-Miranda warning silence for two reasons: First, the Court said that a defendant's silence in response to Miranda warnings is "insolubly ambiguous." Id. at 617. Second, the Court held that by giving Miranda warnings, the Government implicitly assures a defendant that he will not be penalized for exercising those rights by remaining silent.[1] Id. at

---

[1] The "insolubly ambiguous" rationale has since been discarded. See Brecht v. Abrahamson, 507 U.S. 619, 628 (1993). But Miranda's assurance that silence carries no penalty is sufficient alone to maintain the Doyle general rule as a requirement of fairness and due process. See Portuondo v. Agard, 529 U.S. 61, 74-75 (2000); Brecht, 507 U.S. at 629; Wainwright v. Greenfield, 474 U.S. 284,

10

618.

The Supreme Court made clear in <u>Doyle</u>, however, that the there are exceptions to its general rule.  For example, the rule does not apply when a defendant testifies at trial that he told his exculpatory story at the time of his arrest.  <u>Id.</u> at 619 n.11.  In such a case, the prosecution may introduce defendant's post-arrest silence to impeach his trial testimony that upon arrest he did not remain silent but told his exculpatory story.  <u>Id.</u>; <u>accord</u> <u>United States v. Allston</u>, 613 F.2d 609, 610 (5th Cir. 1980); <u>United States v. Dixon</u>, 593 F.2d 626, 630 (5th Cir. 1979); <u>United States v. Fairchild</u>, 505 F.2d 1378, 1383 (5th Cir. 1975); <u>United States v. Shue</u>, 766 F.2d 1122, 1129 (7th Cir. 1985) (citing <u>Fairchild</u>, <u>supra</u>).  Under that exception, however, the defendant's silence is admissible only for the limited purpose of rebutting the impression that the accused had actively cooperated with the police.  <u>Fairchild</u>, 505 F.2d at  1383.  It does not give the government the license to use post-arrest silence in every aspect of the case.  <u>Shue</u>, 766 F.2d at 1130 (citing <u>Fairchild</u>, <u>supra</u>).  Although the government may use a defendant's post-arrest silence to impeach testimony about the circumstances of an arrest, the government may not then argue that the defendant's silence was inconsistent with his claim of innocence.  <u>Id.</u> (citing also <u>United States v. Mavrick</u>, 601 F.2d 921 (7th Cir. 1979)).

---

294 (1986); <u>Fletcher v. Weir</u>, 455 U.S. 603, 605 (1982).

11

Consequently, in the present case, we conclude that the prosecutor, in his final comment during his closing argument, went beyond permissible impeachment and argued that the jury should infer Rodriguez's guilt directly from his post-arrest silence. The prosecutor argued that "the most important evidence in this case concerning Mr. Rodriguez's intent" was the contrast between his trial testimony and his failure to give his exculpatory story to the postal inspectors or supervisors: "On May 19, when the inspectors took him upstairs, he did not say . . ., 'Hey, this is a security test.' . . . And when management came in to talk to him about his job status, he did not say, not one time and not a peep, 'This is just a security test.'" Plainly, the prosecutor urged the jury to consider Rodriguez's silence as direct evidence of his guilt or knowing intent to fail to remit the deposit bags to the designated depository.[2] Because Rodriguez's silence was admissible only for the purpose of rebutting the impression that he had

---

[2] We emphasize that it was the prosecutor's foregoing final comment that crossed the <u>Doyle</u> line. The prosecutor's questioning of Rodriguez during cross-examination was a permissible attempt to impeach and clarify Rodriguez's direct testimony that possibly implied that he had given his exculpatory story to the postal inspectors during his initial interrogation. <u>Doyle</u>, 426 U.S. at 619 n.11. Further, the prosecutor's comment during rebuttal closing argument on Rodriguez's failure to inform his co-workers of his "security test" was permissible because it was a comment on Rodriguez's pre-arrest silence, which is not prohibited by <u>Doyle</u>. <u>See</u> <u>Jenkins v. Anderson</u>, 447 U.S. 231, 240 (1980). Finally, because the <u>Doyle</u> error described in the text above requires reversal, we need not consider whether the unobjected-to prosecutorial comments constituted plain errors also warranting reversal. <u>See</u> <u>United States v. Carter</u>, 953 F.2d 1449, 1463 (5th Cir. 1992).

informed the postal inspectors of his exculpatory story shortly after his arrest and <u>Miranda</u> warnings, the prosecutor's comments in closing argument should have been excluded and a corrective instruction should have been given.  <u>Fairchild</u>, 505 F.2d at 1383.

B.

Although the prosecutor's final comment on Rodriguez's post-arrest, post-<u>Miranda</u> warning silence during his closing argument was impermissible under <u>Doyle</u>, we must determine whether the error was harmless.  <u>United States v. Laury</u>, 985 F.2d 1293, 1304 (5th Cir. 1993); <u>United States v. Shaw</u>, 701 F.2d 367, 382 (5th Cir. 1983).  "The leading case in this Circuit analyzing the harmless error test as applied to <u>Doyle</u> violations is <u>Chapman v. United States</u>."  <u>United States v. Meneses-Davila</u>, 580 F.2d 888, 893 (5th Cir. 1978) (citing <u>Chapman</u>, 547 F.2d 1240 (5th Cir. 1977)); <u>see also</u> <u>United States v. Rodriguez</u>, 43 F.3d 117, 121 (5th Cir. 1995) (reaffirming the use of the Fifth Circuit's <u>Chapman</u> harmless error test for <u>Doyle</u> violations).

A prosecutor's impermissible reference to a defendant's post-arrest, post-<u>Miranda</u> warnings silence may be cured by a fact-dependent, case-by-case determination of harmless error.  <u>Meneses-Davila</u>, 580 F.2d at 893.  In <u>Chapman</u>, we harmonized the case law, categorizing prosecutors' impermissible comments on silence into

13

three categories:

(1) When the prosecution uses defendant's post-arrest silence to impeach an exculpatory story offered by defendant at trial and the prosecution directly links the implausibility of the exculpatory story to the defendant's ostensibly inconsistent act of remaining silent, reversible error results even if the story is transparently frivolous.

(2) When the prosecutor does not directly tie the fact of defendant's silence to his exculpatory story, i.e., when the prosecutor elicits that fact on direct examination and refrains from commenting on it or adverting to it again, and the jury is never told that such silence can be used for impeachment purposes, reversible error results if the exculpatory story is not totally implausible or the indicia of guilt not overwhelming.

(3) When there is but a single reference at trial to the fact of defendant's silence the reference is neither repeated nor linked with defendant's exculpatory story, and the exculpatory story is transparently frivolous and evidence of guilt is otherwise overwhelming, the reference to defendant's silence constitutes harmless

14

error.[3]

547 F.2d at 1249-50 (quoted in Meneses-Davila, 580 F.2d at 893; Rodriquez, 43 F.3d at 121).  "Reversible error results in the first two situations, but not the third."  Meneses-Davila, 580 F.2d at 894.

This case falls within the first Chapman reversible error category.  That category mandates reversal when the prosecutor links defendant's silence to the implausibility of his exculpatory story.  The prosecutor in the present case did that by implying that the defendant's exculpatory story was a post-arrest fabrication, and used the defendant's failure to give his explanation to the postal inspectors or to his supervisors before he was suspended to support that conclusion.  Indeed, the prosecutor argued to the jury that Rodriguez's post-arrest silence was "the most important evidence in this case concerning . . . intent."  Reversible error occurred whether or not defendant's testimony about his intention to merely check or demonstrate the ineffective security practices used during the postal proceeds

---

[3]  For analytical purposes, it is important to differentiate cases falling within Chapman's first category from cases in the other two categories.  The second and third categories articulated in Chapman "are not to be used as rigid rules," Alderman v. Austin, 695 F.2d 124, 126 n.7 (5th Cir. 1983), but only as helpful guides; when "cases cannot be resolved solely by reference to the Chapman categories[,] . . . we apply a case-by-case approach using the Chapman categories as guidelines for assessing prejudice." Rodriquez, 43 F.3d at 121-22.

transfer process was unbelievable.  See Meneses-Davila, 580 F.2d at 895.

C.

Rodriguez argues that the government's evidence regarding his intent to fail to remit the deposit bags to the bank guard "was far from overwhelming."  We must reach Rodriguez's argument regarding the sufficiency of the evidence against him "because the Government may not retry [Rodriguez] if the evidence at the first trial was insufficient."  Id. at 896 (citing Burks v. United States, 437 U.S. 1, 11 (1978) ("The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding.")); see also United States v. Moses, 94 F.3d 182, 188 (5th Cir. 1996) ("In cases where the reversal permits the Government to retry the defendant, we must reach a sufficiency of the evidence argument because the Government may not retry the defendant if the evidence at trial was insufficient.").

We review sufficiency of the evidence by examining the evidence and all reasonable inferences therefrom in the light most favorable to the verdict, to determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  Glasser v. United States, 315 U.S. 60 (1942); see also United States v. Willis, 6 F.3d 257, 264 (5th Cir. 1993).

16

Rodriguez does not argue on appeal, nor did he counter evidence presented at trial, that he failed to remit the deposits to the designated depository, see 18 U.S.C. § 1711, but argues merely that the evidence was insufficient to prove that he had the requisite knowing and willing intent with regard to that failure. The government elicited testimony that Rodriguez placed the deposit bags into the parcel locker in the public lobby, and that he left the key to the locker in the lock. We believe a rational trier of fact could draw the inference from this testimony that Rodriguez did not intend to safeguard the deposits until he could retrieve them and deposit them with the designated depository.

Rodriguez's only evidence offered to counter this proof of intent was his own testimony that he intended the diversion of deposits as a security test, which he planned to conclude by disclosing the diverted deposits to his co-workers before depositing them with the designated depository. However, the government elicited testimony from Rodriguez that he did not tell any of his co-workers about his security test between the time he left the bags in the locker and when he was called to the workroom door by the investigators, which time the trial testimony shows lasted as long as 50 minutes. This testimony undermines Rodriguez's defense of lack of intent. See Brecht, 507 U.S. at 628 ("Such [pre-arrest] silence is probative and does not rest on any implied assurance by law enforcement authorities that it will carry no penalty."). Therefore, reading the testimony regarding

17

Rodriguez's leaving of the key in the lock and regarding his failure to report his security test to co-workers prior to his arrest, and the inferences therefrom, in the light most favorable to the verdict, we find that a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.

## III.

For the foregoing reasons, the final judgment of the trial court is REVERSED and this case is REMANDED for proceedings consistent with this opinion.