# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 2, 2008

Charles R. Fulbruge III
Clerk

No. 06-10847

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

BOBBY DWAINE FAMBRO,

Defendant–Appellant.

Appeal from the United States District Court
for the Northern District of Texas

Before HIGGINBOTHAM, SMITH, and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

Bobby Dwaine Fambro was convicted by a jury of being a felon in possession of a firearm[1] and was sentenced to 327 months' imprisonment. Regarding his conviction, Fambro argues in this appeal that: (1) there was insufficient evidence of his possession of the firearm; (2) the prosecutor violated his due process right to freedom from self-incrimination by commenting on Fambro's failure to deny knowledge or ownership of the firearm when questioned after his arrest; and (3) the prosecutor violated his due process rights by tainting prospective jurors with "commitment" questions during voir dire. Regarding his sentence, Fambro argues that the district court: (1) improperly applied the

---

[1] See 18 U.S.C. § 922(g).

relevant conduct provisions of the federal Sentencing Guidelines; (2) erred in determining that Fambro was an Armed Career Criminal; and (3) violated Fambro's Sixth Amendment right to trial by jury by enhancing his sentence on the basis of facts not found by a jury beyond a reasonable doubt. We affirm the conviction and sentence.

I

Law enforcement officers executed a warrant to search Fambro's home and encountered Fambro in his bedroom, walking from his bed toward the bedroom door and pulling on his pants. Laura MacArthur was lying in the bed. A subsequent search revealed a .22-caliber semi-automatic pistol in a dresser drawer near the bed from which Fambro had arisen.

Fambro was indicted and tried for the offense of being a felon in possession of a firearm. A jury convicted him, and at sentencing, the district court concluded that Fambro was an armed career criminal.[2] His base offense level was determined to be 34, and the district court concluded that he had a criminal history category of VI, which resulted in an advisory sentencing guidelines range of 262 to 327 months' imprisonment. Pursuant to 8 U.S.C. § 924(e), the statutory range of imprisonment was 15 years to life. The district court sentenced Fambro to 327 months in prison. Fambro has appealed.

II

We first consider Fambro's contention that there is insufficient evidence to support the finding that he possessed the firearm found in the bedroom he was sharing with MacArthur when the search was performed. "The standard of review in assessing a challenge to the sufficiency of the evidence in a criminal case is whether a 'reasonable trier of fact could have found that the evidence

---

[2] See 18 U.S.C. § 924(e).

established guilt beyond a reasonable doubt.'"[3] We view "all evidence and all reasonable inferences drawn from it in the light most favorable to the government."[4]

The government proceeded under a theory of joint constructive possession of the pistol. "In general, a person has constructive possession if he knowingly has ownership, dominion, or control over the contraband itself or over the premises in which the contraband is located. Constructive possession need not be exclusive, it may be joint with others, and it may be proven with circumstantial evidence."[5] In challenges to the sufficiency of the evidence establishing constructive possession, we use a "commonsense, fact-specific approach."[6] Control or dominion over the place in which a weapon is found is not by itself sufficient to establish constructive possession when there is joint occupancy.[7] "We have found constructive possession in such cases only when there was some evidence supporting at least a plausible inference that the defendant had knowledge of and access to the weapon or contraband."[8]

As the officers entered Fambro's bedroom, he was walking toward the doorway and dressing. MacArthur was still in bed. Fambro was approximately five to six feet from the dresser drawer in which the weapon was subsequently found. The dresser was approximately three to four feet from the bed. The

---

[3] United States v. Mergerson, 4 F.3d 337, 341 (5th Cir. 1993) (citing United States v. Bell, 678 F.2d 547, 549 (5th Cir. 1982) (en banc)).

[4] Id.

[5] United States v. McKnight, 953 F.2d 898, 901 (5th Cir. 1992) (internal citations omitted).

[6] See Mergerson, 4 F.3d at 349 (citing United States v. Smith, 930 F.2d 1081, 1086 (5th Cir. 1991)).

[7] See id. (citing McKnight, 953 F.2d at 902, and Smith, 930 F.2d at 1086).

[8] Id.

weapon was discovered surrounded by several pairs of white socks. One of the officers testified at trial that he thought the socks were men's because of their size and thickness. The jury was shown a video of the gun surrounded by the socks. In another dresser drawer, men's gloves were found. There were no fingerprints on the gun, and its magazine clip was missing. The clip was found in MacArthur's purse.

After Fambro had been arrested and the Miranda warnings had been read to him, he responded to questions by one of the officers. Fambro said he and MacArthur were present when the pistol was purchased in Louisiana several months before, although he did not indicate which of them actually bought the weapon. He said they brought it with them from Louisiana to Clyde, Texas, where Fambro's home is located, in an automobile.

From these facts, a reasonable jury could infer beyond a reasonable doubt that Fambro had joint dominion and control over the weapon. Fambro knew of the gun's existence from the time it was purchased. The gun was with him and MacArthur as they traveled from Louisiana to Texas. The gun was found in Fambro's home, in a dresser drawer in close proximity to him. The fact that the gun's magazine clip was in MacArthur's purse does not mean that it was inaccessible to him particularly in light of their intimacy. Additionally, the gun was stored in a drawer containing items of clothing that the jury saw on a videotape and could reasonably infer belonged to a male rather than a female.

III

Fambro contends that the prosecutor impermissibly commented on his failure to deny knowledge or possession of the weapon after he had been apprised of his Miranda rights. He contends that his Fifth Amendment due

process rights and privilege against self incrimination were violated. Fambro failed to object at trial, so we review for plain error.[9]

There are three limitations on appellate authority under Rule 52(b).[10] There must be an error,[11] that error must be plain, which means clear or obvious,[12] and the error must affect substantial rights, which means in most cases[13] that it was prejudicial in that it affected the outcome of the district court proceedings.[14] However, "Rule 52(b) is permissive, not mandatory. . . . [T]he court of appeals has authority to order correction, but is not required to do so."[15] We "should correct a plain forfeited error affecting substantial rights if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"[16]

As noted above, after Fambro had been arrested and the Miranda warnings had been read to him, he answered several questions from an arresting

---

[9] See United States v. Garcia-Flores, 246 F.3d 451, 457 (5th Cir. 2001); see also Brecht v. Abrahamson, 507 U.S. 619, 629 (1993) ("Doyle error fits squarely into the category of constitutional violations which we have characterized as 'trial error' . . . and is amenable to harmless-error analysis because it 'may be . . . quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial].'") (citations omitted, alteration in original).

[10] See United States v. Olano, 507 U.S. 725, 732 (1993) (citing FED. R. CRIM. P. 52(b)).

[11] Id.

[12] Id. at 734.

[13] Id. at 735 ("We need not decide whether the phrase 'affecting substantial rights' is always synonymous with 'prejudicial'. . . . There may be a special category of forfeited errors that can be corrected regardless of their effect on the outcome. . . . Nor need we address those errors that should be presumed prejudicial if the defendant cannot make a specific showing of prejudice. Normally, although perhaps not in every case, the defendant must make a specific showing of prejudice to satisfy the 'affecting substantial rights' prong of Rule 52(b).").

[14] Id. at 734.

[15] Id. at 735.

[16] Id. at 736.

officer about the pistol. He said he and MacArthur were present when it was purchased in Louisiana, and they brought the gun to Clyde, Texas. The officer asked Fambro to give a taped interview to repeat these statements, but Fambro declined. Fambro said that he did not want to give any type of statement, and the officer terminated the interview. At trial, the officer was asked to recount what Fambro said about the firearm and was asked whether Fambro at that time denied knowing of its existence. In closing argument, the prosecutor told the jury that when Fambro spoke to the officer after he was arrested, he did not deny knowledge or possession of the firearm.

Fambro cites Doyle v. Ohio for the proposition that a criminal defendant's silence following receipt of Miranda warnings may not be used as direct or substantive evidence of his guilt at trial.[17] The Supreme Court has explained "that Doyle rests on 'the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial.'"[18] Fambro did not testify at trial. But the principles of Doyle apply even if a defendant does not take the stand in his own defense thereby subjecting himself to potential impeachment.[19] A defendant is entitled to rely on the assurance when he is "Miranda-ized" that

---

[17] See Doyle v. Ohio, 426 U.S. 610, 617-20 (1976).

[18] Wainwright v. Greenfield, 474 U.S. 284, 291 (1986) (quoting South Dakota v. Neville, 459 U.S. 553, 565 (1983)).

[19] See generally United States v. Cardenas Alvarado, 806 F.2d 566, 569, 573-75 (5th Cir. 1986) (applying Doyle to determine whether prosecutor's questions or closing arguments impermissibly commented on the defendant's statements after receiving Miranda warnings even though the defendant did not testify at his trial).

his silence will not be used against him.[20] The Miranda warnings are deemed to have induced the silence.[21]

The Supreme Court has recognized, however, that "a defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all."[22] This conclusion was reached in a case in which a defendant was cross-examined about prior, inconsistent, post-Miranda-warning statements.[23] But as support for this conclusion, the Supreme Court cited the First Circuit's decision in United States v. Goldman.[24] The analysis in Goldman did not concern cross-examination or impeachment. The issue was whether the prosecutor was entitled to introduce into evidence the defendant's post-Miranda statements in response to questioning, or to comment on those statements in summation.[25] During his post-Miranda interview, the defendant in Goldman had given an exculpatory statement but did not respond to certain questions regarding the names and addresses of witnesses he had mentioned or questions

---

[20] Portuondo v. Agard, 529 U.S. 61, 74 (2000) ("'[W]e have consistently explained Doyle as a case where the government had induced silence by implicitly assuring the defendant that his silence would not be used against him.'") (quoting Fletcher v. Weir, 455 U.S. 603, 606 (1982)).

[21] See Brecht v. Abrahamson, 507 U.S. 619, 628-29 (1993) ("[T]he State's references to petitioner's silence after that point in time, or more generally to petitioner's failure to come forward with his version of events at any time before trial . . . crossed the Doyle line. For it is conceivable that, once petitioner had been given his Miranda warnings, he decided to stand on his right to remain silent because he believed his silence would not be used against him at trial.").

[22] Anderson v. Charles, 447 U.S. 404, 408 (1980).

[23] Id. ("Doyle does not apply to cross-examination that merely inquires into prior inconsistent statements.").

[24] Id. (citing Goldman, 563 F.2d 501, 503-04 (1st Cir. 1977)).

[25] Goldman, 563 F.2d at 504.

about blank checks in his possession.[26] The First Circuit reasoned that the defendant had waived his Miranda rights[27] and held: "Because the defendant waived his rights and made a statement, the prosecutor was entitled to introduce that statement at trial and comment on it during summation."[28] The court did not attempt to parse information provided in the defendant's statements from his failure to respond to certain questions:

> Here, however, as in Vitali v. United States, 383 F.2d 121 (1st Cir. 1967), the defendant did not stand on his rights. After hearing the Miranda warnings, he chose to make an exculpatory statement, and he answered most of the agent's questions probing that statement. We find that these facts meet the high standards of proof of waiver that Miranda . . . sets out.
>
> "A defendant cannot have it both ways. If he talks, what he says or omits is to be judged on its merits or demerits, and not on some artificial standard that only the part that helps him can be later referred to. This was not a case where the government commented upon . . . a prior exercise of rights. The government asked the jury to measure what the defendant said when he had no rights because he had voluntarily waived them."[29]

The First Circuit also concluded that the defendant in Goldman had not asserted his right to remain silent simply by failing to answer questions about the names and addresses of witnesses or by avoiding a direct explanation of the checks.[30] The court accordingly did not "decide whether the Fifth Amendment gives a suspect the right to answers questions selectively."[31]

---

[26] Id. at 503 n.2.

[27] Id. at 503.

[28] Id. at 504.

[29] Id. at 503 (quoting Vitali, 383 F.2d at 123).

[30] Id. at 504.

[31] Id.

In determining whether there has been a *Doyle* violation, our circuit's decisions have turned on a case-by-case, fact-specific analysis, and at times, there seems to be inconsistencies in our reasoning. However, our decisions support the conclusion that there was no *Doyle* violation in the case before us today, and even if there were error, it was not plain or obvious.

Before we turn to an analysis of this court's pertinent decisions, we think it helpful to identify with some precision what the prosecution said at trial. The following exchange took place between the prosecutor and the arresting officer during direct examination:

> Q. At any time when you were speaking with Mr. Fambro, did he say, "I don't know anything about that Beretta [pistol] or any other gun you found in my house"?
>
> A. No, ma'am, he did not.
>
> Q. At any time, did he say, "Laura [MacArthur] had a gun, but I don't know anything about it"?
>
> A. No, ma'am, he did not.

This testimony only emphasizes what Fambro had said in his post-Miranda statement. He admitted that he knew about the pistol and that MacArthur was present when it was purchased and transported to Texas.

During closing argument the prosecutor referred to Fambro's failure to deny knowledge of the pistol: "And just as telling is what he doesn't say. When Agent Lopez asks him about the firearm, he doesn't say, 'What? What firearm? What are you talking about?'" Again, this simply emphasized Fambro's admissions that he knew about the existence of the gun.

In rebuttal argument, the prosecutor once again commented on Fambro's failure to deny knowledge of the weapon but additionally pointed out Fambro's failure to deny possession of the gun or to deny knowing it was in the dresser drawer:

When he talked to Agent Lopez – and I asked Agent Lopez when he was on the stand, "Did Mr. Fambro ever tell you that he didn't know what you were talking about, that yes, he and Laura bought the gun in Louisiana, but he didn't know what Laura had done with it? Did he even deny to you any knowledge or possession of that firearm?" "No, he didn't." Now, he had the opportunity to do that, to say, "Agent Lopez, I don't know what you're talking about. It was in my drawer. I had no idea it was there." He never said that.

This argument is limited in time to the statements made to the arresting officer immediately after Fambro was taken into custody. It does not inquire if Fambro "ever," including at all times through trial, denied knowledge or possession of the pistol. Much of this argument reinforces that Fambro admitted knowledge of the gun. All statements in testimony and arguments to the effect that Fambro did not deny knowledge of the gun's existence or its transportation to Texas are comments on what Fambro said, not on his silence. However, Fambro did not admit in so many words that he "possessed" the gun, nor did he say that he was aware that the gun was in his dresser drawer. Possession and knowledge of the pistol's location at the time of the search were not expressly addressed by Fambro in his post-Miranda-warnings statements, and the prosecutor's statements on those subjects in closing argument are our focus.

The rationale of this court's en banc decision in United States v. Beechum[32] indicates that the prosecution's statements were not improper. In Beechum, a substitute letter carrier was suspected by his employers of stealing from the mail.[33] They planted a letter in a mailbox along his route that contained a silver dollar and other items.[34] The silver dollar was not in the letter when Beechum delivered the mail he had retrieved on his route to his station, and an inspector

---

[32] 582 F.2d 898 (5th Cir. 1978).

[33] Id. at 903.

[34] Id.

confronted him.[35]  The inspector read the Miranda warnings to Beecham, and a search revealed the silver dollar in Beecham's pocket as well as two unsigned credit cards in his wallet that had been issued to persons other than Beecham.[36] The cards had been mailed by Sears, Roebuck & Co. ten months earlier to addresses on Beecham's route.  Beechum was convicted of unlawfully possessing the silver dollar.  His only post-Miranda-warnings statements related to the credit cards, not the silver dollar,[37] but this court held that the inspector's testimony at trial about Beechum's statements and the prosecutor's comments to the jury about those statements were not improper.

The Beechum decision reflects that "[o]n direct examination, the Government elicited from the arresting inspector testimony indicating that Beechum gave no explanation for his possession of the silver dollar at the time of his arrest," and that "[i]n closing argument, the prosecutor made the following remarks concerning Beechum's conduct after his arrest.  'Mr. Beechum gave no explanation for his possession of the silver dollar.  In fact, he told (the inspector), "You have all the answers, and I don't have any for you."'"[38]  This court held that it was significant that Beechum "chose to speak"[39] and reasoned that the

---

[35] Id. at 904.

[36] Id.

[37] Id., describing the statements as follows:

The arresting inspector questioned Beechum about the credit cards, and Beechum responded first that the only credit cards he possessed were his own. Later, when confronted with the Sears cards, he stated that he had never used them. The inspector testified that in response to further questioning concerning the cards, Beechum said, "Since you have all the answers, you tell me." Record, vol. 2, at 31, 201. The inspector inquired no further.

[38] Id. at 906.

[39] Id.

prosecutor's statement was "an appraisal of what Beechum said" rather than a comment on Beechum's silence.[40]

The reasoning in Beechum strongly suggests, if not dictates, that there was no violation of Doyle in the present case, including the prosecutor's arguments that Fambro had the opportunity to deny possession of the gun but did not and similarly did not deny that he knew the gun was in the drawer. In Beechum, the credit cards had been mailed, and presumably taken by Beechum, ten months before the silver dollar was planted in the mail. The credit cards were the only subject of Beechum's post-Miranda statements.[41]

Another decision of this court supporting the conclusion that there was no Doyle violation in the present case is United States v. Pennington, in which the

---

[40] Id. The court's reasoning, in its entirety, follows:

Had Beechum in fact remained silent at the time of his arrest, we might entertain doubts as to the propriety of the testimony and comment. [citing Doyle v. Ohio, 426 U.S. 610 (1976); Chapman v. United States, 547 F.2d 1240, 1247-50 (5th Cir. 1977)]. Beechum, however, chose to speak. After the inspector had informed him about the test letter and after Beechum had been read his rights, he chose to reply to the inspector's initial inquiry with the remark that the only credit cards he possessed were his own. When confronted with the Sears cards found in his wallet, he explained that they had never been used. His final response to the questioning was that the inspector could answer any other questions himself because he had all the answers. In context, the latter two of these remarks are tantamount to admissions of guilt. Beechum knew that he was the subject of an investigation for rifling the mails because the inspectors had told him that they had planted a test letter. He was caught red-handed with the coin and the credit cards. All that he could say was, "You have all the answers."

    The prosecutor's statement, therefore, is not a comment on Beechum's silence but rather an appraisal of what Beechum said. In effect, the prosecutor was saying, "Beechum did not explain his possession of the silver dollar. In fact, he admitted that he had no explanation for it, because they already had all the answers." Under these circumstances, neither the witness's testimony nor the prosecutor's remarks were improper.

[41] Beechum, 582 F.2d at 906.

defendant was convicted of possession with intent to distribute marijuana.[42] At trial a customs agent was asked by the prosecutor to recount Pennington's post-Miranda-warnings statements. The agent replied that when he asked Pennington how 591 pounds of marijuana had gotten into his truck, Pennington "just became silent and he said he didn't have anything to say about it."[43] The prosecutor then asked, "Mr. Pennington didn't deny knowing about it, he merely told you that, 'I have nothing to say,'" to which the agent replied, "That is correct."[44] During rebuttal argument, the prosecutor paraphrased this testimony.[45] Although this court stated in Pennington that "the defendant's willingness to give some statements after arrest does not give the prosecutor the right to impeach him by commenting on what he did not say,"[46] the court seems to have agreed with the Government's argument that "the prosecutor was only commenting on what Pennington said, not what he did not say."[47] This court also concluded that "the testimony only served to impeach Pennington's claim not to have known about the marihuana."[48]

A subsequent decision of this court in United States v. Garcia-Flores[49] is difficult to reconcile with Pennington.[50] In Garcia-Flores, the defendant was

---

[42] 20 F.3d 593, 595-96 (5th Cir. 1994).

[43] Id. at 599.

[44] Id.

[45] Id. ("And at some point finally the border patrol agent said, 'How else can you explain 591 pounds of dope in your truck?' And he says, 'I don't have anything to say about that.'").

[46] Id.

[47] Id.

[48] Id.

[49] 246 F.3d 451 (5th Cir. 2001).

[50] Pennington, 20 F.3d at 599.

accused of possessing with intent to distribute[51] 300 pounds of marijuana[52] concealed in a trailer he was pulling. His wife said at trial that a man named Ramon called their home and left directions for her husband to go to a particular business to pick up a trailer.[53] In a post-Miranda-warnings statement, the defendant referred only to a man, and when asked who the man was, the defendant repeated "the man" and then asked for an attorney.[54] This exchange was elicited from the agent by the prosecutor at trial,[55] and in closing arguments the prosecutor paraphrased this testimony and asked the jury whether the failure to identify Ramon when questioned by the agent was "consistent with somebody that really doesn't know that he was carrying marijuana in the trailer or is it something consistent with someone that does know and doesn't want to say anything about where he picked it up."[56] The prosecutor made other comments about Garcia-Flores's failure to mention Ramon when Garcia-Flores was arrested at the checkpoint.[57] This court concluded that Garcia-Flores "did not describe the man in detail" because "he asserted his right to counsel," and there was a Doyle violation because "the intent of the government in its closing statement was to create an inference from Garcia-Flores' refusal to accurately describe the man."[58]

---

[51] Garcia-Flores, 246 F.3d at 453.

[52] Id. at 455.

[53] Id. at 453.

[54] Id. at 456.

[55] Id.

[56] Id.

[57] Id. at 457.

[58] Id.

Another of our decisions seems internally inconsistent. In United States v. Cardenas Alvarado, the defendant did not testify at trial[59] but maintained that he was uninvolved in the crime.[60] He and a number of others were seen by government agents toting large bundles of marijuana, and the other defendants testified at trial that they were coerced at gunpoint to transport the bundles across the border. Cardenas Alvarado gave a post-Miranda-warnings statement in which he said he did not know where he was taking the marijuana, to whom it belonged, or how much he had been paid to carry it,[61] which was recounted at trial by the arresting officer.[62] This court held there was no Doyle violation when the prosecutor elicited further testimony from the government agent to point out the fact that Cardenas Alvardo never offered any excuse or justification for his action, did not tell the agent he had been threatened or that he had been forced to carry the marijuana, and offered no explanation as to why the group was bringing the marijuana into the United States.[63] The court held, "Doyle is inapplicable to these statements. . . . [T]here is no indication that Cardenas invoked his Miranda rights. . . . Instead of remaining silent, Cardenas responded to the agents' questions. Consequently, Doyle does not apply."[64]

Conversely, the court also held in Cardenas Alvarado that the prosecutor's comments about this testimony did violate Doyle.[65] It concluded that "[t]he

---

[59] 806 F.2d 566, 569 (5th Cir. 1986).

[60] Id. at 575 (referring to "Cardenas' defense of noninvolvement" as opposed to "his codefendants' coercion story").

[61] Id. at 569.

[62] Id. at 573.

[63] Id.

[64] Id.

[65] Id. at 575.

15

prosecutor's comment would naturally be seen by the jury as a comment on Cardenas' failure to offer an exculpatory story immediately as well as a general attack on his credibility."[66] It is difficult to see how this reasoning was applicable to the prosecutor's comments but not the prosecutor's use of almost identical rhetorical questions in his examination of the agent.

At least one decision of this court, United States v. Laury, has held that whether a prosecutor's statements violate Doyle turns on whether the defendant's post-Miranda-warnings statements were inconsistent with his trial testimony.[67] In that case, the defendant made statements to the FBI when he was arrested on suspicion of committing a bank robbery. He told agents, among other things, that he did not rob the bank, he was in Calvert, Texas a few days before Christmas, near the town of Rosebud where the robbery occurred that December, and gave explanations for the sources of large cash expenditures he made in December and January.[68] At trial, he claimed to have been at a party in Dallas on the date of the robbery.[69] In cross-examining Laury, the prosecutor emphasized through questions that Laury did not tell the FBI about this alibi but waited until he "g[o]t to court."[70] The prosecutor also mentioned this in

---

[66] Id. The court further reasoned:

> We agree with Cardenas that the . . . prosecutor's closing argument violate[d] Doyle. All of the prosecutor's comments concern a time period after the Border Patrol agents had apprehended Cardenas and his Miranda protection against interrogation had commenced. It seems clear that not only did the prosecutor intend to comment on Cardenas' silence, but the jury would naturally construe it in that way.

[67] 985 F.2d 1293, 1303-04 (5th Cir. 1993).

[68] Id. at 1299.

[69] Id.

[70] Id. at 1301.

closing argument.[71] This court held these were violations of Doyle because "[t]he prosecutor did not comment on what Laury told FBI agents, but on what he did not tell them," and "[b]ecause Laury's post-arrest and trial statements were not inconsistent, we view the prosecutor's comments as comments on Laury's post-arrest silence, and therefore in violation of Doyle."[72] This decision suggests that Fambro's position at trial, which was that the gun was MacArthur's, was not inconsistent with his failure to deny that he possessed the gun or to deny that he knew it was in the drawer and therefore that there was a Doyle violation.

Another of this court's decisions, United States v. Rodriguez,[73] is consistent with Laury.[74] At trial the prosecutor extensively cross-examined the defendant about his failure to tell authorities during a post-Miranda-warnings seven-minute interview or a subsequent three-minute interview that his alleged theft had been a security test.[75] In closing argument, the prosecutor dwelled on the defendant's failure to come forward with the explanation sooner.[76] This court held that this violated Doyle.[77]

We conclude that we are bound by this court's en banc decision in United States v. Beechum.[78] That decision and others discussed above indicate that there was no Doyle violation in this case. To the extent that other decisions of

---

[71] Id. ("He doesn't tell the FBI he has an alibi, there's no talk.").

[72] Id. at 1303-04.

[73] 260 F.3d 416 (5th Cir. 2001).

[74] United States v. Laury, 985 F.2d 1293 (5th Cir. 1993).

[75] Rodriguez, 260 F.3d at 419-20.

[76] Id. at 420.

[77] Id. at 422.

[78] 582 F.2d 898 (5th Cir. 1978).

this court might compel a different conclusion, they indicate only that the law in this area is not clear. As the Supreme Court has said, "[a]t a minimum, court[s] of appeals cannot correct an error pursuant to Rule 52(b) unless the error is clear under current law."[79] There was no plain *Doyle* error in this case.

IV

Fambro asserts that during voir dire the prosecutor violated Fambro's due process rights by asking what Fambro calls "stake-out" questions that committed the jurors to finding that Fambro possessed the firearm at issue before the evidence was presented. We do not approve of "commitment" questions of the variety at issue here. However, there was no plain error, as we shall explain.

During voir dire, the prosecutor posed a series of hypothetical questions to the prospective jurors with facts very similar to those that would be introduced at trial. One was:

> Let's say that law enforcement finds a box of grenades and they're trying to determine whether I possessed those grenades. My first question, would it be important to you whether the grenades were found in my house or not? Would that be an important factor, do you think, in determining whether I possessed the grenades? How many think it would be important? If you do, please raise your hand.

The prosecutor continued:

> Let me add another piece of evidence onto it. Let's say the grenades are found in my house and that they are found in a box, and with the grenades in the box are some adult T-shirts that happen to fit my size, that are the size of shirt I wear. Do you think that would be important in determining whether I possessed the grenades or not? Okay. If you do think it's important, please raise your hand.

---

[79] United States v. Olano, 507 U.S. 725, 734 (1993) (citing FED. R. CRIM. P. 52(b)); see also United States v. Salinas, 480 F.3d 750, 759 (5th Cir. 2007) (holding there was no plain error "[b]ecause this circuit's law remains unsettled" and recognizing that error is not obvious when the case law conflicts), cert. denied, 128 S. Ct. 487 (2007).

After addressing one prospective juror who did not agree, the prosecutor continued:

> Let me add one more twist to our little fact scenario. Let's say that during an interview with law enforcement, I'm talking with the officer and I say, yes, the grenades were bought in Arizona. I was there and I brought them back to Lubbock. How many people think that would be important? Okay. Is there anyone here who thinks it wouldn't be important?

The prosecutor concluded: "If you had heard all of that and you were asked to decide, did [I] possess the grenades found in [my] house, how many people think I did possess those grenades? How many people think that I did not possess those grenades?" The prosecutor referred back to these questions during closing statements.

A defendant's right to due process under the Fifth Amendment requires an impartial jury at least to the same extent required by the Sixth Amendment.[80] As the Eighth Circuit has explained, "although there are no constitutional provisions directly addressing the use of hypothetical questions during voir dire, there may be circumstances where a party's manner of conducting voir dire renders a jury [non-]impartial and thereby triggers a Sixth Amendment violation."[81] We have stated that a voir dire question that "in effect asked the jury how it would weigh evidence it had not heard" would "not be a proper line of inquiry."[82] A majority of states appear to prohibit hypothetical

---

[80] See Morgan v. Illinois, 504 U.S. 719, 726-27 (1992). Although Morgan addressed the due process clause of the Fourteenth Amendment, we are aware of no reason the Fifth Amendment's due process clause would provide less protection of the right to an impartial jury than does that of the Fourteenth Amendment.

[81] Hobbs v. Lockhart, 791 F.2d 125, 129 (8th Cir. 1986).

[82] See Sandidge v. Salen Offshore Drilling Co., 764 F.2d 252, 257 (5th Cir. 1985).

questions to prospective jurors on voir dire to determine how they would decide fact issues in a case.[83]

The questions in this case were highly suspect because they do not "further the purpose of voir dire—i.e., discerning bias or prejudice in prospective jurors."[84] The facts of the hypothetical scenario presented by the prosecutor were virtually identical to the central facts she would later introduce at trial. Nevertheless, we are unaware of any decision by the Supreme Court or any federal appellate court that has reversed a district court because it allowed commitment questions on voir dire in violation of the due process clause or the Sixth Amendment. Moreover, there was considerable evidence from which the jury could reasonably conclude that Fambro possessed the firearm. We therefore cannot say that the error, if any, was plain.

V

Fambro challenges his sentence on several grounds. We first consider his argument that in determining that he was an armed career criminal within the meaning of 18 U.S.C. § 924(e), the district court should not have relied solely on the pre-sentencing report's conclusion that Fambro had three prior violent felony convictions.[85] The PSR identified two prior convictions under Texas law for burglary and a third conviction for aggravated robbery. Fambro faults the

---

[83] See generally S.R. Shapiro, Propriety and effect of asking prospective jurors hypothetical questions, on voir dire, as to how they would decide issues of case, 99 A.L.R.2d 7 (1965); Ted A. Donner & Richard K. Gabriel, Jury Selection Strategy and Science § 18:2 (3d ed. 2006).

[84] Sandidge, 764 F.2d at 258.

[85] See 18 U.S.C. § 924(e) (defining "violent felony" to include "any crime punishable by imprisonment for a term exceeding one year" that "(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.").

district court for not requiring the probation officer to provide certified copies of documents or any other proof of these prior convictions.

Fambro concedes that he did not object in the district court to the use of the PSR to establish that he is an armed career criminal, nor did he request the district court to require the Government to provide certified copies or other proof regarding the prior convictions. Indeed, not only did Fambro fail to object, he conceded in the district court that he was an armed career criminal. In his written objections to the PSR on other grounds, Fambro said:

> Defendant concurs that his criminal history puts him under the Armed Career Criminal statute.
>
> * * *
>
> Defendant, while acknowledging his status as an armed career criminal, avers that the base offense level is 33.
>
> * * *
>
> Defendant avers that the correct base offense level should be 33, based on USSG § 4B1.4(b)(3)(B), and his status under the Armed Career Criminal Act.

The Government contends these statements amounted to a waiver. We do not resolve the waiver question because, even if Fambro did not waive his complaint that the district court improperly relied on the PSR, Fambro's contentions fail.

Had the district court relied solely on the PSR in concluding that Fambro was an armed career criminal within the meaning of 18 U.S.C. § 924(e), the district court would have been in error. The Supreme Court held in Shepard v. United States with regard to the Armed Career Criminal Act that "a later court determining the character of [a prior conviction] is generally limited to examining the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented."[86] This circuit has additionally held in the context of applying the sentencing guidelines that "[t]he PSR . . . may not serve

---

[86] 544 U.S. 13, 16 (2005).

21

as the basis for finding that a prior conviction was of a crime of violence,"[87] and that "the district court's sole reliance on the PSR to determine that the prior conviction was a crime of violence constituted clear and obvious error under Supreme Court and Fifth Circuit precedent."[88]  However, we cannot say that the district court relied solely on the PSR in light of Fambro's counsel's multiple written statements to the district court that Fambro was an armed career criminal within the meaning of the Act.  The district court's failure to examine or require production of appropriate documentation of Fambro's prior convictions was not plain error under these circumstances.

We note that in his initial brief in this court, Fambro did not raise any other challenge to the determination that he is an armed career criminal, aside from his contention that his Sixth Amendment right to trial by jury was violated because his status as an armed career criminal was not submitted to a jury.  He acknowledges that this issue is foreclosed by precedent.  After Fambro submitted his initial brief, the Government moved to supplement the appellate record to provide documentation of Fambro's prior convictions.  In his reply brief, Fambro for the first time contends that one of the prior convictions that allegedly supports his status as an armed career criminal was not a violent felony within the meaning of 18 U.S.C. § 924(e).

The documents the Government has now provided indicate that Fambro was convicted in Texas in 1981 of burglary of a building.  The only statute covering such an offense when Fambro's 1980 burglary occurred was TEX. PENAL CODE § 30.02 (West 1974).  That statute could be violated by entering a building

---

[87] United States v. Turner, 349 F.3d 833, 837 (5th Cir. 2003).

[88] United States v. Martinez-Vega, 471 F.3d 559, 562 (5th Cir. 2006), cert. denied, 127 S. Ct. 1851 (2007).

without the intent to commit a felony or theft.[89]  We have held that "Taylor requires that the defendant intend to commit a crime at the time of unlawful entry or remaining in,"[90] and have noted that TEX. PENAL CODE § 30.02(a)(3) "requires no such intent."[91]  Accordingly, we agree with Fambro that, at least based on the documents before us, it is not evident that his 1980 burglary conviction was for a violent felony within the meaning of 18 U.S.C. § 924(e).

There are two issues that must be resolved, however, before we reach the question of whether we should conduct a plain error analysis to determine if Fambro's sentence is to be vacated.  The first issue, whether Fambro has waived any complaint about the finding that he is an armed career criminal, we do not resolve because the second question is dispositive.  That is whether we may consider an issue that was first raised in an appellant's reply brief and on which an appellant seeks to reverse or vacate a district court's judgment or sentence.  Our precedent is clear that ordinarily we may not,[92] and we do not do so here.  There was no mention whatsoever in Fambro's initial brief of the specifics of his prior conviction, much less argument and citation of authorities on the question of whether his 1980 burglary under Texas law was a "generic burglary."  Whether Fambro has prior convictions that permitted him to be sentenced as an armed career criminal and whether his counsel's written statements to the district court that Fambro is an armed career criminal amounted to ineffective

---

[89] TEX. PENAL CODE § 30.02(a)(3) ("A person commits an offense if, without the effective consent of the owner, he . . . enters a building or habitation and commits or attempts to commit a felony, theft, or assault.").

[90] United States v. Herrera-Montes, 490 F.3d 390, 392 (5th Cir. 2007) (citing Taylor v. United States, 495 U.S. 575 (1990)).

[91] Id. (citing Flores v. State, 902 S.W.2d 618, 620 (Tex. App.—Austin 1995, writ ref'd)).

[92] See United States v. Fields, 483 F.3d 313, 352 n.36 (5th Cir. 2007), cert. denied 128 S. Ct. 1065 (2008); United States v. Aguirre-Villa, 460 F.3d 681, 683 n.2 (2006), cert. denied 127 S. Ct. 3053 (2007); United States v. Jackson, 426 F.3d 301, 304 n.2 (2005).

assistance of counsel are matters that can, and we expect will, be considered in a proceeding under 28 U.S.C. § 2255.

## VI

Fambro was convicted for possession of one firearm found in his home. He contends that the district court erred in holding him accountable for sentencing purposes for 17 other firearms that were subsequently found at other locations. The Government contended, and the district court found, that Fambro had been involved in a number of burglaries from 2002 through 2004 and that he and others had stolen 17 firearms during the course of those burglaries. However, we do not reach the merits of Fambro's contentions regarding the propriety of considering these additional weapons because they had no impact on the advisory guidelines sentencing range that the district ultimately concluded applied to Fambro.

The sentencing guideline range that the district court found applied to Fambro was calculated based on section 4B1.4 of the sentencing guidelines, which applies to an armed career criminal.[93] Under section 4B1.4(b)(3)(A), which the district court concluded applied to Fambro, Fambro's base offense level was determined to be 34.[94] He had no reduction for acceptance of responsibility, so his total offense level was found to be 34.

The district court performed an alternative calculation under Chapters Two and Three of the Guidelines, as directed by section 4B1.4(b) to determine the greatest of the offense levels.[95] It was only in this latter, alternative calculation that the district considered the 17 firearms. The offense level of 34 under section 4B1.4(3)(A) was the greater than the alternative calculation, so

---

[93] U.S. SENTENCING GUIDELINES MANUAL § 4B1.4 (2005).

[94] Id. § 4B1.4(b)(3)(A).

[95] See id. § 4B1.4(b)(1), (2), (3) ("The offense level for an armed career criminal is the greatest of . . . .").

24

the calculation of the offense level that had taken the 17 weapons into account was not used. We will not offer an advisory opinion as to whether the sentencing range was properly calculated under Chapters Two and Three of the Guidelines.

Fambro's final argument is that his Sixth Amendment rights were violated because the district court enhanced his sentence on the basis of facts not found by a jury beyond a reasonable doubt. These facts include "the various conduct-related enhancements," as well as Fambro's prior criminal conduct. He concedes that this argument is foreclosed by our case law.[96]

\* \* \*

For the reasons considered above, we AFFIRM Fambro's conviction and sentence.

---

[96] As United States v. Pineda-Arrellano, 492 F.3d 624 (5th Cir. 2007), makes clear, "this issue no longer serves as a legitimate basis for appeal." United States v. Rosas-Pulido, No. 06-41223, 2008 U.S. App. LEXIS ___, at *___ (5th Cir. May 1, 2008). See also Pineda-Arrellano, 492 F.3d at 625 (holding that the Sixth Amendment does not require a jury to find the fact of prior convictions to support enhancements under the illegal reentry statute, 8 U.S.C. § 1326(b), or the Armed Career Criminal Act), cert. denied, 128 S. Ct. 872 (2008); United States v. Stevens, 487 F.3d 232, 245-46 (5th Cir. 2007) (explaining that the Sixth Amendment and United States v. Booker, 543 U.S. 220 (2005), permit the sentencing judge to find all facts relevant to the determination of the advisory Guidelines range by a preponderance of the evidence), cert. denied, 128 S. Ct. 336 (2007).