**REVISED December 18, 2013**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

—————

No. 12-40472
c/w No. 12-40477

United States Court of Appeals
Fifth Circuit

**FILED**
December 17, 2013

Lyle W. Cayce
Clerk

—————

UNITED STATES OF AMERICA

                                         Plaintiff-Appellee

v.

JOSE JULIAN ANDAVERDE-TIÑOCO

                                         Defendant-Appellant

-------------------------------------------------------------------------------------------------

UNITED STATES OF AMERICA

                                         Plaintiff-Appellee

v.

JOSE JULIAN ANDAVERDE-TIÑOCO, also known as Julian Rodriguez-Hernandez

                                         Defendant-Appellant

—————

Appeals from the United States District Court
for the Southern District of Texas

—————

Before SMITH, DENNIS, and HIGGINSON, Circuit Judges.

HIGGINSON, Circuit Judge:

No. 12-40472 c/w No. 12-40477

A jury found Jose Julian Andaverde-Tiñoco guilty of illegal reentry subsequent to removal after conviction of an aggravated felony, in violation of 8 U.S.C. § 1326(a) and (b). The district court sentenced him to 70 months of imprisonment and three years of supervised release. It also revoked a previously imposed term of supervised release and sentenced him to eight months of imprisonment, four months of which were to run consecutively and four concurrently to the 70-month sentence, for a total of 74 months. He appeals. For the reasons that follow, we AFFIRM his conviction and sentence.

I.

On March 9, 2011, United States Border Patrol agent Carlos Ortega observed four individuals attempting to make their way north from the Rio Grande. Ortega called two other agents, Luis Garza and Ernest Granado, to the scene. The agents detained and handcuffed the individuals, including Defendant-Appellant Jose Julian Andaverde-Tiñoco ("Andaverde-Tiñoco"). According to Andaverde-Tiñoco's testimony on cross-examination, the agents read him his *Miranda* rights in Spanish while in the field.

Granado transported the individuals by car to a nearby Border Patrol station. Granado testified that, during the ride, one of Andaverde-Tiñoco's companions said that the companions had been "beaten and robbed" on the Mexican side of the river but did not specify when or where that had happened or mention anything about being forced to cross the river. Granado also testified that there were no marks or indications of recent physical abuse on any of the individuals. Granado did not follow up on this information, pass it along to the other agents, or write any report.

At the station, the four companions were processed, and the other three were granted voluntary returns to Mexico. Andaverde-Tiñoco was not eligible for a voluntary return because of his criminal and immigration history, so he was processed as a criminal alien. Agent Eron Hernandez testified that he

2

No. 12-40472 c/w No. 12-40477

interviewed Andaverde-Tiñoco at the station and that the first thing he did was read Andaverde-Tiñoco his *Miranda* rights in Spanish. A written record of the interview—which Hernandez prepared and Andaverde-Tiñoco read, approved, and signed—showed that Andaverde-Tiñoco admitted that he was a Mexican citizen, that he had entered the United States on March 9, 2011 by swimming across the Rio Grande, that he had previously been deported or removed from the United States and never applied for permission to return, and that he did not fear any persecution or torture if he were to be removed to Mexico. According to Hernandez's testimony, Andaverde-Tiñoco did not mention that he had been robbed on the other side of the Rio Grande, nor did other agents mention to Hernandez that any of Andaverde-Tiñoco's companions had claimed to have been robbed.

A one-count indictment charged Andaverde-Tiñoco with illegal reentry subsequent to removal after conviction of an aggravated felony, in violation of 8 U.S.C. § 1326(a) and (b). The government also moved to revoke a previously imposed term of supervised release that resulted from a prior illegal-reentry conviction.

At trial, Andaverde-Tiñoco stipulated to the elements of the offense, yet presented the defense that he reentered under duress and hence was not criminally responsible for his actions. Andaverde-Tiñoco called border agent David Montoya, who testified that he had interviewed the other individuals and that one of them had said they had been robbed before crossing. Andaverde-Tiñoco testified and described how, on the day of the arrest, he and three friends were driving in Mexico when armed men stopped them and robbed them of their vehicle and money. He further testified that the men brought him and his friends to the river and told them to cross or be shot, that he begged the men not to make him cross because he would be sent to prison, and that he crossed the river because he felt he had no choice. He admitted

3

that he did not mention the robbery when initially detained or during transport to the station, but then he stated that he told the agents about the robbery while they fingerprinted and interviewed him and that the agents did not write anything down or record the conversation.

Approximately two hours after starting deliberations, the jury sent a note stating that the jurors were deadlocked at a six-to-six vote. The district court proposed that it give an *Allen* charge to the jury. Andaverde-Tiñoco objected—arguing that the jurors had not been deliberating for long, the trial was short, and most of the evidence was uncontroverted—and requested a mistrial. The district court overruled the objection, denied the motion for a mistrial, and sent the *Allen* charge to the jury. Approximately two-and-a-half hours after receiving the charge, the jury found Andaverde-Tiñoco guilty.

At sentencing, Andaverde-Tiñoco attempted to present an affidavit of Daniel Reyna Flores, one of his companions on the night of the arrest, who corroborated most of his story. The government objected. The district court refused to admit the affidavit because it was hearsay, but allowed the investigator who obtained the affidavit to testify as to some of the statements Reyna Flores made to him, including that he had been forced across the river. Andaverde-Tiñoco pleaded "true" to the facts alleged in the petition for revocation of supervised release. The district court sentenced him to 70 months of imprisonment and three years of supervised released. It also revoked the previously imposed term of supervised release and sentenced him to eight months of imprisonment, four months of which were to run consecutively to the 70-month sentence, for a total of 74 months. Andaverde-Tiñoco timely appealed the conviction and sentence.

II.

Andaverde-Tiñoco argues first that the district court abused its discretion by giving an *Allen* charge to the jury. The relevant inquiry on appeal

No. 12-40472 c/w No. 12-40477

is whether: (1) any semantic deviation from approved *Allen*-charge language was so prejudicial that it requires reversal and (2) the circumstances surrounding the use of the charge were coercive. *United States v. Winters*, 105 F.3d 200, 203 (5th Cir. 1997). Generally, we review the use of an *Allen* charge for abuse of discretion. *Id.* Where a defendant does not object to its use, review is for plain error. *United States v. Hitt*, 473 F.3d 146, 153 (5th Cir. 2006). The government argues that Andaverde-Tiñoco's objection to the charge in the district court failed to preserve his challenge on appeal. "A party must raise a claim of error with the district court in such a manner so that the district court may correct itself and thus, obviate the need for our review." *United States v. Gutierrez*, 635 F.3d 148, 152 (5th Cir. 2011) (internal quotation marks and footnote omitted). "[T]he touchstone is whether the objection was specific enough to allow the trial court to take testimony, receive argument, or otherwise explore the issue raised." *United States v. Burton*, 126 F.3d 666, 673 (5th Cir. 1997).

> Andaverde-Tiñoco objected to the *Allen* charge as follows:

> As the Court is aware, this is a very short trial. Most of it was completely uncontroverted. The controverted evidence is extremely short, and the fact that the jurors already said that they couldn't reach a verdict and they're divided numerically six to six, your Honor, I believe an Allen charge would not be appropriate at this time, and we ask for a mistrial.

Andaverde-Tiñoco cites *United States v. Montalvo,* 495 F. App'x 391, 392 n.2 (5th Cir. 2012) (unpublished), to argue that a general objection to an *Allen* charge that does not mention the language itself is sufficient to preserve that issue for appeal. However, our unpublished *Montalvo* decision is inapposite. There, although the government argued that Montalvo had not objected to the language of the *Allen* charge, Montalvo himself did not make the language argument on appeal. Thus, the court looked only to the circumstances of the charge, an objection that the court found Montalvo had adequately made

No. 12-40472 c/w No. 12-40477

below. *Id.* at 392-93 & n.2; *cf. Hitt*, 473 F.3d at 153 & n.5 (reviewing for plain error where defendant objected to charge *in toto* but not to language specifically); *United States v. Hill*, 334 F. App'x 640, 645 (5th Cir. 2009) (unpublished) (reviewing language for plain error where objection to charge did not include objection to its language). The objection does not reference the language of the charge, so the district court "could not have understood," *Gutierrez*, 635 F.3d at 152, that Andaverde-Tiñoco wanted additional or adjusted language included in the charge, particularly because the district court used the language from the then-applicable Fifth Circuit Pattern Jury Instructions. FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (CRIMINAL), § 1.45 (West 2001). However, the objection does directly address the coerciveness of the charge under the circumstances and thus preserves that issue for appeal. Therefore, we review the language of the charge for plain error and the use of the charge for abuse of discretion.

A.

Under the first prong of the *Allen* analysis, we inquire whether any semantic deviation from approved *Allen*-charge language was so prejudicial that it requires reversal. *Winters*, 105 F.3d at 203. As stated above, we review the language of the charge in this case for plain error. To prevail under plain error, an appellant must show a forfeited error that is clear or obvious and that affects his substantial rights. *Puckett v. United States*, 556 U.S. 129, 135 (2009). If he makes such a showing, we have the discretion to correct the error, but only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.* In reviewing jury instructions, "plain error occurs only when the instruction, considered as a whole, was so clearly erroneous as to result in the likelihood of a grave miscarriage of justice." *United States v. Garcia*, 567 F.3d 721, 728 (5th Cir. 2009) (internal quotation marks and citation omitted).

6

No. 12-40472 c/w No. 12-40477

Here, the language of the modified *Allen* charge was almost identical to the charge found in the then-applicable 2001 Pattern Jury Instructions, a fact we previously have noted in upholding *Allen* charges. *See United States v. Allard*, 464 F.3d 529, 536 (5th Cir. 2006). The only modification was the addition of a sentence that reminded the jury not to reveal the exact numerical breakdown of its voting, an addition that Andaverde-Tiñoco does not challenge. Instead, Andaverde-Tiñoco argues that the charge was unbalanced because it focused on the government's burden of proof on the elements of the illegal entry offense, which Andaverde-Tiñoco had conceded, and did not address his burden of proof on the duress defense.

The failure to include additional language about the duress defense was not a clear or obvious error. Andaverde-Tiñoco acknowledges that the charge was equivalent to the then-applicable pattern instruction. The cases that Andaverde-Tiñoco cites do not stand for the proposition that failure to include *additional* language in an otherwise-approved pattern instruction constitutes error.

Even if he had shown a clear or obvious error, Andaverde-Tiñoco has not shown that the failure to include language about his duress defense affected his substantial rights. To make that showing, he must "demonstrate that the error affected the outcome of the district court proceedings." *United States v. Broussard*, 669 F.3d 537, 553 (5th Cir. 2012). Because Andaverde-Tiñoco stipulated to the offense,[1] his theory for why the jury should find him not guilty become only his affirmative duress defense. The *Allen* charge asked the jurors who believed Andaverde-Tiñoco was guilty to reconsider this conclusion in

---

[1] In the ill-defined posture of a "stipulated" trial, it is especially incumbent on a party to adhere to the specificity requirements of Federal Rule of Criminal Procedure 30(d). *Cf. United States v. Richardson*, 713 F.3d 232, 234 n.2 (5th Cir.), *cert. denied*, 134 S. Ct. 230 (2013).

light of the fact that other jurors believed him to be not guilty. The *Allen* charge also instructed the jurors to follow their initial instructions, which included the duress defense, and we presume that jurors follow their instructions. *See, e.g., United States v. Turner*, 674 F.3d 420, 430 (5th Cir. 2012). Finally, the jury deliberated for more than two hours after receiving the *Allen* charge, presumably on the duress defense because that was the only issue at trial. For these independent reasons, Andaverde-Tiñoco has not shown that the district court plainly erred in the language of the *Allen* charge.

B.

Under the second prong of an *Allen*-charge analysis, we inquire whether the circumstances surrounding the use of the charge were coercive. *Winters*, 105 F.3d at 203. We evaluate the "totality of the circumstances" surrounding the use of the charge in assessing its coercive effect. *United States v. Lindell*, 881 F.2d 1313, 1321 (5th Cir. 1989). The district court has "broad discretion to evaluate whether an Allen charge is likely to coerce a jury into returning a verdict it would not otherwise return." *Allard*, 464 F.3d at 536 (internal quotation marks and citation omitted). As stated above, we review the use of the charge in this case for abuse of discretion.

Andaverde-Tiñoco argues that the use of the *Allen* charge after approximately two hours of deliberations "sent a strong message that failure to reach a verdict was not an option"; that the jury received the charge close to midday on a Friday, which "surely raised fears that inability to reach a verdict that day would result in the jury's being called in for deliberations on Saturday"; that the jury's decision to deliberate without taking a lunch break suggests that it felt pressure to reach a verdict before the weekend; that skipping lunch "created the possibility that some jurors might cave in simply because of overwhelming feelings of hunger"; and that the jury reached a

verdict only two hours after receiving the charge, which "is strongly suggestive of the coercive effect of the *Allen* charge."

We have affirmed *Allen* charges in more stringent circumstances than those here. In *United States v. Betancourt*, 427 F.2d 851, 854 (5th Cir. 1970), we affirmed a charge where the trial had begun at 9 a.m. on the day of the verdict, the jury did not receive the case until 6:13 p.m., it reported itself deadlocked at 8:19 p.m., and it returned its verdict at 10:23 p.m. on a stormy night. In *United States v. Bottom*, 638 F.2d 781, 788 (5th Cir. Unit B Mar. 1981), we affirmed an *Allen* charge, explaining: "The jury deliberated another three hours after the 'Allen' charge was given from 9:56 A.M. to 1:40 P.M., not an unduly short amount of time. The time of the day was not late. The day was not Friday or the day before a holiday. The weather was not alleged to be inclement." Here, although the district court gave the charge on a Friday, it was not late in the day or close to a holiday, and the jury deliberated for about two-and-a-half hours after receiving the charge. The timing here also presented less potential for coerciveness than it did in *Betancourt. Cf. Montalvo*, 495 F. App'x at 393-94 (rejecting challenge to *Allen* charge that jury received less than four days before Christmas because it was not issued on the day before a holiday; there was no indication that the jury expressed concern about, or that the judge mentioned, the approaching holiday; and the circumstances that may have pressured the jury were less extreme than those in *Betancourt*).

Additionally, we have rejected a claim that the jury's decision to forego a meal renders an *Allen* charge coercive. *United States v. Reeves*, 892 F.2d 1223, 1229 (5th Cir. 1990). We have also rejected claims of coerciveness with similarly short and even shorter deliberation periods. *See Bottom*, 638 F.2d at 788 (charge given after eight hours of deliberation, verdict returned three hours after *Allen* charge); *United States v. Scruggs*, 583 F.2d 238, 241 (5th Cir.

No. 12-40472 c/w No. 12-40477

1978) (charge given after four-and-a-half hours of deliberation, verdict returned 48 minutes after charge); *United States v. Bailey*, 468 F.2d 652, 664-65 (5th Cir. 1972) (charge given after three-and-a-half hours of deliberation, verdict returned one-and-a-half hours after charge); *Andrews v. United States*, 309 F.2d 127, 129 (5th Cir. 1962) (charge given after one hour and five minutes of deliberation, verdict returned 25 minutes after charge). We conclude here that Andaverde-Tiñoco has not shown that the district court abused its discretion in its use of the *Allen* charge.

## III.

Second, Andaverde-Tiñoco argues that the government improperly elicited testimony and argued to the jury that he had remained silent instead of immediately informing the agents that he had been forced to cross the river, in violation of *Doyle v. Ohio*, 426 U.S. 610, 619 (1976). Crucial to our ruling, Andaverde-Tiñoco did not object to the alleged *Doyle* violations in the district court, hence review is for plain error. *See United States v. Garcia-Flores*, 246 F.3d 451, 457 (5th Cir. 2001). Andaverde-Tiñoco must show a forfeited error that is clear or obvious and that affects his substantial rights. *Puckett* 556 U.S. at 135. If he makes such a showing, we have the discretion to correct the error, but only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.*; *see also Henderson v. United States*, 133 S. Ct. 1121, 1130 (2013).

## A.

Under the first and second prongs of plain error review, we inquire whether there was an error that was clear or obvious. As a threshold matter, the government argues that "the vast state of the evidence was that Andaverde was not read his [*Miranda*] rights until he arrived at the Border Patrol station." As such, the government contends that commentary on Andaverde-Tiñoco's silence during the ride to the station could not have violated *Doyle*. To

No. 12-40472 c/w No. 12-40477

support its argument, the government attempts to explain the following exchange between the prosecutor and Andaverde-Tiñoco on cross-examination:

Cross-Examination of Andaverde-Tiñoco by Prosecutor

Q: But you said when Border Patrol arrived you hunkered down in the field, right?

A: Yes, yes.

Q: And you hunkered down so they wouldn't see you, didn't you?

A: Yes.

Q: And they handcuffed you, didn't they?

A: Yes.

Q: And they read you your rights in Spanish?

A: Yes.

Q: And they placed you in the back of a vehicle?

A: Yes.

The government claims that the prosecutor "simply made a mistake" when asking this question and that the question did not differentiate between the field and the station, so Andaverde-Tiñoco's answer was "technically correct."

This argument is unpersuasive. There is no dispute in the existing record over whether the agents read Andaverde-Tiñoco his rights in the field. There is no evidence beyond the government's *ipse dixit* that the prosecutor made a mistake, and the context of the question belies the government's claim. The question came in chronological order after a question about Andaverde-Tiñoco's behavior in the field and before a question about his ride to the station. The only persuasive reading of this testimony and exchange is that the agents read Andaverde-Tiñoco his rights in the field. Nothing in the record contradicts

11

No. 12-40472 c/w No. 12-40477

that (even Agent Hernandez's affirmative testimony that he read Andaverde-Tiñoco his rights at the station) because the prosecutor never confirmed with the agents themselves, testifying at trial, if they read the rights in the field. We credit the trial record that the agents read Andaverde-Tiñoco his rights in the field.

Having testified to that *Miranda* factual predicate, Andaverde-Tiñoco asserts that there were five *Doyle* violations that occurred during his trial. We set them out below and highlight the alleged violations in italics.

Alleged Violation 1: Cross-Examination of Agent Granado by Defense

Counsel

Q: Now, once you knew that another -- a person among these four people was being prosecuted, did you feel it's your duty as a [sic] officer for Border Patrol to report to someone that some people had claimed having been victimized before they crossed?

A: Yes. *But it was not the defendant that made that statement*, so, therefore, for me, that would be hearsay, and no, I did not make that statement to anybody else.

Alleged Violation 2: Redirect Examination of Agent Granado by Government

Q: You say there's only one that—only one of the agent—aliens mentioned anything about being beaten and robbed?

A: That is correct.

Q: The other three were there, obviously, in the back of the vehicle, correct?

A: Yes, sir.

*Q: And none of them said anything about it at the time?*

*A: No, sir.*

*Q: That would include the defendant?*

12

No. 12-40472 c/w No. 12-40477

*A: That is correct.*

### Alleged Violation 3: Cross-Examination of Andaverde-Tiñoco

*Q: At no point did you ever tell any of the agents that you had been robbed on the other side, did you, up until the point that you were at the Border Patrol station like you're saying?*

A: That's right, until I was at the Immigration office.

*Q: And when they found you in the field, you didn't go running to them at all saying, "Oh help. I need your help. Someone on the other side wants to get me," did you?*

A: No.

### Alleged Violation 4: Government's Closing Argument

When they saw the lights of the Border Patrol vehicles, they laid down and hid. They didn't run up to them and say, "Thank God you're here. We needed some help. We got robbed." No, they hid. When the agents shined their flashlights on them, they ran.

So what did the defendant do after he actually got caught here and put in the Border Patrol vehicle? He starts joking with the agent. *He doesn't say anything about the alleged robbery.*

One of the other aliens that was in the vehicle, he took the opportunity to make some sort of claim of a robbery. Didn't say when or where really, but he made a claim. *The defendant was right there. He said nothing.*

### Alleged Violation 5: Government's Rebuttal Argument

Two Border Patrol agents were dispatched out to the scene, and when they were dispatched out to the scene, the defendant hid. They arrested him. They put him in the back of their vehicle, *and he never once said anything to them about being forced.* That was another person.

Under *Doyle*, 426 U.S. at 619, and its progeny, "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving Miranda warnings, violate[s] the Due Process Clause." "A prosecutor's or

13

witness's remarks constitute comment on a defendant's silence if the manifest intent was to comment on the defendant's silence, or if the character of the remark was such that the jury would naturally and necessarily so construe the remark." *United States v. Carter*, 953 F.2d 1449, 1464 (5th Cir. 1992) (citation omitted). However, the Court in *Doyle* made clear that the government could use a defendant's post-*Miranda* silence to challenge a defendant who testifies to an exculpatory version of events and claims to have told the police that version following arrest. *Doyle*, 426 U.S. at 619 n.11. "We, and other circuits, have continued to recognize this 'open the door' or 'reply' exception to *Doyle*." *United States v. Martinez-Larraga*, 517 F.3d 258, 268 (5th Cir. 2008) (citations omitted); *see also United States v. Rodriguez*, 260 F.3d 416, 421 (5th Cir. 2001).

At the same time, the "open the door" exception does not afford the government free reign to invoke the defendant's post-arrest silence. "Although the government may use a defendant's post-arrest silence to impeach testimony about the circumstances of an arrest, the government may not then argue that the defendant's silence was inconsistent with his claim of innocence." *Rodriguez*, 260 F.3d at 421 (citations omitted). In other words, the government may not ask the jury to "infer . . . guilt directly from . . . post-arrest silence." *Id.* When the impeachment exception is not met, the *Doyle* test "is strict; virtually any description of a defendant's silence following arrest and a *Miranda* warning will constitute a *Doyle* violation." *United States v. Shaw*, 701 F.2d 367, 382 (5th Cir. 1983); *see also United States v. Edwards*, 576 F.2d 1152, 1155 (5th Cir. 1978).

Granado's statement on cross-examination by defense counsel did not violate *Doyle*. The "manifest intent" of Granado's response was not to comment on Andaverde-Tiñoco's post-*Miranda* silence in a way that improperly inferred his guilt. *See Carter*, 953 F.2d at 1464; *see also United States v. Clark-Gonzalez*, 530 F. App'x 372, 380 (5th Cir. 2013) (unpublished) (declining to find a *Doyle*

14

error where, among other reasons, the witness's comment was elicited not by the prosecution but by defense counsel); *United States v. Moreno*, 185 F.3d 465, 472 (5th Cir. 1999) (stating that, in assessing a *Doyle* violation, the court seeks "to determine whether the remark was a spontaneous comment by the witness or a comment prompted by the prosecutor"). Granado's statement, heard by the jury before any reference to Andaverde-Tiñoco's being given *Miranda* warnings in the field, was not prompted by the prosecutor but by defense counsel on cross-examination, and it is best read as a response to a question about why Granado did not report the statement of someone other than Andaverde-Tiñoco.

Likewise, the prosecutor's redirect of Granado did not violate *Doyle*. Defense counsel's opening statement implying that Andaverde-Tiñoco had immediately informed the agents of his exculpatory story opened the door to narrow permissible impeachment by the government:

<u>Opening Argument by Defense Counsel</u>

They're taken to get processed, and you're going to hear from agents of the government that while they're being taken to the Harlingen station, they talked. They talked how they were scared [sic]. They talked that they were robbed on the other side, and they talked that they were forced to cross.

This opening argument use of the plural pronoun "they" created the false impression that Andaverde-Tiñoco and his companions, collectively, promptly cooperated and told their duress story and that the agents had failed to respond. Additionally, Andaverde-Tiñoco's cross-examination of Granado attempted to undermine his credibility precisely by suggesting that he did not report this duress story. Thus, the prosecutor's redirect of Granado was "a permissible attempt to impeach and clarify" defense counsel's exculpatory version of duress and hasty cooperation upon arrest. *Rodriguez*, 260 F.3d at 421 n.2.

The prosecutor's cross-examination of Andaverde-Tiñoco presents a closer question. Defense counsel, on direct examination of Andaverde-Tiñoco, first reinforced his opening argument by eliciting proof for the duress story, but then specifically elicited that Andaverde-Tiñoco himself had remained silent on the ride to the station:

Direct Examination of Andaverde-Tiñoco by Defense Counsel

Q: Did the officer seem interested to hear details about the claim your companions have made that they were forced to cross?

A: He was talking to them all along the route, but I never said anything.

Q: Why wouldn't you have told the officer right then and there, 'I didn't want to come in. They forced me to come in.'?

A: No, I said that at the Immigration office.

Q: So in the vehicle you didn't tell the driver?

A: No.

On the one hand, then, the prosecutor's subsequent questions on cross-examination may have been an attempt to clarify the tension between defense counsel's opening statement and Andaverde-Tiñoco's direct testimony that only his companions spoke on the way to the station. *Cf. Rodriguez*, 260 F.3d at 419-420, 421 n.2 (finding cross-examination question about silence permissible where it followed defendant's direct testimony that implied he had told exculpatory story during his initial interrogation). It is determinative, however, that Andaverde-Tiñoco testified that he had *not* said anything on the way to the station. In an abundance of caution, and because we find that the government's statements during its closing and rebuttal arguments were clear *Doyle* errors, we assume for purposes of our plain error analysis that the

No. 12-40472 c/w No. 12-40477

government cross-examination of Andaverde-Tiñoco extended beyond a testing of collective cooperation to improper *Doyle* impeachment.

In other words, whereas the government initially took the permissible tack of impeaching Andaverde-Tiñoco's version of collective cooperation, the government went beyond "a permissible attempt to impeach and clarify" once Andaverde-Tiñoco delimited his exact version of post-arrest cooperation to his companions. Consequently, we conclude that the government improperly invoked Andaverde-Tiñoco's post-arrest silence in this closing-argument assertion: "So what did the defendant do after he actually got caught here and put in the Border Patrol vehicle? He starts joking with the agent. He doesn't say anything about the alleged robbery. . . . One of the other aliens that was in the vehicle, he took the opportunity to make some sort of claim of a robbery. Didn't say when or where really, but he made a claim. The defendant was right there. He said nothing." And the government repeated the error in rebuttal argument: "They put him in the back of their vehicle, and he never once said anything to them about being forced." In this summation argument, the government "directly link[ed] the implausibility of the defendant's exculpatory story to his ostensibly inconsistent post-arrest silence." *Price v. King*, 714 F.2d 585, 588 (5th Cir. 1983). Determinatively, again, the government did so after Andaverde-Tiñoco had testified that, unlike his companions, he had not cooperated post arrest by telling his exculpatory story on the way to the station but only later after his second *Miranda* warning, thus obviating the need for further proper impeachment about the time interval between the first and second *Miranda* warnings.

### B.

Under the third prong of plain error review, we inquire whether error affected a defendant's substantial rights. "[T]he defendant must demonstrate that the error affected the outcome of the district court proceedings."

17

*Broussard*, 669 F.3d at 553. Here, the government's closing and rebuttal arguments used Andaverde-Tiñoco's silence to attack his duress defense, the only issue at trial, which resulted initially in a deadlocked jury. *See United States v. Harp*, 536 F.2d 601, 602-03 (5th Cir. 1976) ("Because the prosecutor's comments struck at the jugular of their story, those remarks cannot be classified as harmless.");[2] *see also United States v. Johnson*, 558 F.2d 1225, 1230 (5th Cir. 1977) (holding same under plain error review and finding "it likely that defendant's expressed desire to remain silent tipped the scales for the jury"); *United States v. Meneses-Davila*, 580 F.2d 888, 895-96 (5th Cir. 1978) (holding under plain error review that prosecution's repeated references to defendant's silence in a one-day trial were not harmless, despite defendant's responsive comments on silence). Even though Andaverde-Tiñoco did open the door to some exploration of his companions' post-arrest statements, and even though Andaverde-Tiñoco waived his *Miranda* rights at the station, triggering trial-contested testimony about his own cooperation and duress story, we cannot say that his duress defense presented a frivolous argument that had no chance of success such that the *Doyle* errors did not affect the outcome of the proceedings. *See Rodriguez*, 260 F.3d at 422 (explaining that, in determining when a *Doyle* error is harmless, "[w]hen . . . the prosecution directly links the implausibility of the exculpatory story to the defendant's ostensibly inconsistent act of remaining silent, reversible error results even if the story is transparently frivolous") (citing *Meneses-Davila*, 580 F.2d at 893).

---

[2] Circumstances that render *Doyle* error harmless have defied formulaic precision for almost half a century. *See, e.g.*, *Williams v. Zahradnick*, 632 F.2d 353, 363-65 (4th Cir. 1980) (stating that "[p]erhaps more than any other circuit court, the Fifth Circuit has had occasion to rule upon the harmfulness of Doyle errors" and collecting Fifth Circuit cases).

No. 12-40472 c/w No. 12-40477

C.

Under the fourth and final prong of plain error review, if the appellant has shown an error that is clear or obvious and affects his substantial rights, we may exercise our discretion to correct the error, but only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. The Supreme Court recently highlighted the importance of this fourth prong of plain error review as an independent criterion that helps guard against any potential "floodgates" of plain error corrections. *Henderson* 133 S. Ct. at 1130; *see also United States v. Escalante-Reyes*, 689 F.3d 415, 425 (5th Cir. 2012) (en banc) (calling the fourth prong a "stringent" requirement and "declining to adopt a blanket rule that once prejudice is found under the [third plain error prong], the error invariably requires correction") (internal citation and quotation marks omitted). The Court also has said that "[m]eeting all four prongs is difficult, as it should be." *Puckett*, 556 U.S. at 135 (citing *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n.9 (2004)) (internal quotation marks omitted). Importantly, the burden is on the defendant to demonstrate that the error affects the fairness, integrity, or public reputation of judicial proceedings. *See Broussard*, 669 F.3d at 546.

Although there is no exact test for what type of error seriously affects the fairness of judicial proceedings, recent case law in which we have addressed the fourth prong generally is instructive. In *United States v. McCann*, 613 F.3d 486, 503 (5th Cir. 2010), we held that the error seriously affected the fairness, integrity, or public reputation of judicial proceedings where the district court relied solely on the presentence investigation report to conclude that the defendant's prior manslaughter conviction constituted a "crime of violence" for purposes of sentencing, even though the government admitted that all of the documents that could have conclusively demonstrated the specific facts of the defendant's manslaughter offense were lost in Hurricane Katrina. In

19

No. 12-40472 c/w No. 12-40477

*Escalante-Reyes*, 689 F.3d at 425-26 (internal quotation marks and citation omitted), we found that the district court's reliance on an anger-management justification in increasing the defendant's sentence directly controverted "Congress's express admonition that imprisonment is not an appropriate means of promoting correction and rehabilitation" and thus affected the fairness of the proceedings and required reversal. Conversely, in *United States v. Reyna*, 358 F.3d 344, 352-53 (5th Cir. 2004) (en banc), we found that the denial of a right to allocute at the defendant's third sentencing hearing did not affect the fairness, integrity, or public reputation of judicial proceedings, even though it otherwise met the first three prongs, because the defendant had been given the right to allocute at his original sentencing hearing and at his second sentencing hearing, where he was warned that he would be sent back to prison for twelve months if he violated the terms of his supervised release. As a final example, in *United States v. Seale*, 600 F.3d 473, 490 (5th Cir. 2010) (en banc), we declined to exercise our discretion to correct the district court's error in failing to exclude the defendant's statement under *Miranda* because the government had presented other strong evidence of guilt, it had been the defendant's primary responsibility to persuade the court to exclude the statement, and no miscarriage of justice would occur.

Cognizant that fourth-prong assessments trigger no precise formula, we hold that Andaverde-Tiñoco has not met his burden of showing that the *Doyle* violations we identify rise to the level of error that seriously affects the fairness, integrity, or public reputation of judicial proceedings. First, Andaverde-Tiñoco undercut any *Doyle* claim in his own opening argument asserting collective cooperation upon arrest. Second, Andaverde-Tiñoco reinforced that impression of collective cooperation through his cross-examination probing of Granado, who only responsively commented on Andaverde-Tiñoco's silence. Third, the government's violative summation was

based on Andaverde-Tiñoco's own frank direct-examination acknowledgement that he did not tell "the officer right then and there, 'I didn't want to come in. They forced me to come in.'" In other words, Andaverde-Tiñoco not only proffered in his opening statement his duress defense through alleged collective cooperation with law enforcement, but also then on direct examination highlighted to the jury that he had not told the officers his exculpatory story immediately. In this way, Andaverde-Tiñoco himself drew evidentiary focus on the inconsistency between his post-arrest silence and his duress defense. The government's subsequent cross-examination and summation were cumulative of evidence affirmatively given to the jury by Andaverde-Tiñoco. Finally, Andaverde-Tiñoco did not perceive or object to any of these exchanges or arguments as a *Doyle* violation, even in a new trial motion pursuant to Federal Rule of Criminal Procedure 33. *See Henderson*, 133 S. Ct. at 1130 (explaining that, when courts apply prongs three and four of plain error review, "the fact that a defendant did not object, despite unsettled law, may well count against the grant of Rule 52(b) relief"). We cannot emphasize enough the importance of such prompt intercession, allowing, *inter alia*, a sustained objection, curative instructions, juror voir dire, and especially isolation of any error and avoidance of it in closing arguments.

Although, for the foregoing reasons, we decline to exercise plain error discretion to correct the *Doyle* errors we particularize, this case highlights the risks for the prosecution if it chooses to comment on a defendant's silence after *Miranda* warnings, even in cases, like this one, where a defense opening implies post-arrest cooperation, where the defense then probes and makes central the cooperation story, where no *Doyle* objection is interposed at trial, and where, indeed, a defendant himself highlights to the jury as an incongruity his post-arrest silence. *See Edwards*, 576 F.2d at 1155; *cf. Wainwright v. Greenfield*, 474 U.S. 284, 295 (1986) (noting that questions regarding the

21

No. 12-40472 c/w No. 12-40477

defendant's behavior at the time of his arrest might be permissible if "carefully framed" to "avoid[ ] any mention of the defendant's exercise of his constitutional rights"). [3]

## IV.

Third, Andaverde-Tiñoco argues that at sentencing the district court erred in refusing to accept the affidavit of Daniel Reyna Flores, one of Andaverde-Tiñoco's companions who entered the United States with him. The affidavit corroborated the claim that the men were forced to cross the river, and Andaverde-Tiñoco offered it to support his request for a downward departure based on his claim of duress. The government objected. The district court refused to accept the affidavit on the ground that it contained hearsay, but allowed Andaverde-Tiñoco to call the investigator who obtained the affidavit to summarize Reyna Flores's statements, including that he had been forced across the river. Andaverde-Tiñoco argues that the district court erred in excluding the affidavit as hearsay because the rules of evidence are not applicable in sentencing proceedings. The government argues that the district court was exercising its discretion as to admissibility and simply was not persuaded that the affidavit was reliable.

A district court has wide discretion to decide what evidence to consider or credit at sentencing. *United States v. Cantu-Ramirez*, 669 F.3d 619, 628 (5th

---

[3] The dissenting opinion draws attention to several plain error outcomes we issued shortly after *Doyle*, almost forty years ago, especially *Meneses-Davila*, 580 F.2d at 895-96. Leaving aside the fact that those cases focus on harmlessness analysis and do not discuss the fourth prong as our recent case law has described it, we endorse *Doyle* as strongly here but perceive crucial fourth-prong distinctions. For example, in *Meneses-Davila*, we rejected the claim that the defendant's references to his own silence should allow the conviction to stand because the prosecution made the first reference to the defendant's silence at trial. *Id.* at 895. We then explained, "Had defendant's statement been the first reference in the case to silence, the questioning of the agent would probably have been permissible. . . . [T]he defense did not initiate the comments on silence, but only responded to the prosecutor's prior comments made during the trial." *Id.*

22

Cir.), *cert. denied*, 132 S. Ct. 2759, *and cert. denied*, 133 S. Ct. 247 (2012). We review the decision to reject sentencing evidence for abuse of discretion. *See United States v. Mitchell*, 366 F.3d 376, 379 (5th Cir. 2004). At sentencing, a district court "may consider any relevant evidence without regard to its admissibility under the rules of evidence applicable at trial, provided the information has sufficient indicia of reliability to support its probable accuracy." *United States v. Ramirez*, 367 F.3d 274, 277 (5th Cir. 2004). Even uncorroborated hearsay evidence may be sufficiently reliable for use at sentencing. *See United States v. Gaytan*, 74 F.3d 545, 558 (5th Cir. 1996). Thus, to the extent that the district court thought itself obligated to exclude the affidavit as hearsay, it relied on an erroneous conclusion of law. *Id.*; *see also United States v. Jones*, 664 F.3d 966, 981 (5th Cir. 2011) ("[I]t is an abuse of discretion to rely on erroneous conclusions of law.") (internal citation and quotation marks omitted), *cert. denied*, 132 S. Ct. 2728 (2012). In excluding the affidavit, the district court stated:

> Well, I consider a document like that hearsay. So why—if it's being offered for the truth of the matter asserted, why should I accept it . . . as evidence . . . ? [A] person who was involved . . . in events leading up to an arrest of . . . a person later charged would be prevented from testifying to anything that would be hearsay unless it was an exception. I find no exception in this case, so the objection is sustained.

Though the record is not conclusive, it appears that the district court erroneously did feel obligated to exclude the affidavit as hearsay evidence.

Even if the district court did abuse its discretion, however, any error was harmless. To determine whether an error was harmless, we inquire whether the defendant suffered prejudice from the error. *Reyna*, 358 F.3d at 348; *see also United States v. Meza*, 701 F.3d 411, 425 (5th Cir. 2012). The district court allowed the investigator who obtained the affidavit to testify as to some of the statements Reyna Flores made to him. The district court noted that it afforded

some "leeway" with the investigator's testimony and allowed him to testify, over the government's objection, as to Reyna Flores's statements that they had been forced to cross the river and that Reyna Flores had feared for his life when they crossed. The district court concluded that it did not believe either Reyna Flores's statements or Andaverde-Tiñoco's duress claim, in part due to the lack of corroborating evidence. Because the district court heard and considered the investigator's testimony about the relevant portions of the affidavit, including the claim that the companions were forced to cross the border, we hold that any error in failing to admit the affidavit was harmless.

## V.

Fourth, Andaverde-Tiñoco argues that if we vacate his conviction for illegal reentry, we should also vacate the revocation of his prior term of supervised release and remand for a new proceeding. Because we affirm Andaverde-Tiñoco's conviction and sentence, we need not reach this issue.

The conviction and sentence are AFFIRMED.

No. 12-40472 c/w No. 12-40477

JAMES L. DENNIS, Circuit Judge, dissenting:

I agree with the majority that the government committed multiple constitutional violations causing "clear or obvious" legal errors during Jose Julian Andaverde-Tiñoco's criminal trial.  I further agree with the majority that the government's violations affected the outcome of Andaverde's trial and, had the government not unlawfully urged the jury to convict Andaverde for impermissible reasons, the jury may not have done so.  Unlike the majority, however, I do not agree that this court of law should tolerate a conviction that was obtained in an illegal manner and I would afford a new trial in which Andaverde's guilt or innocence could be determined according to constitutional requisites.  For the reasons that follow, I respectfully dissent.

## I.

## A.

After being spotted by Border Patrol in an empty field near the Texas-Mexico border, Andaverde and several others with him were apprehended.  The arresting agents transported the detainees by motor vehicle to a nearby Border Patrol station.  During the ride, one of Andaverde's companions—but not Andaverde—reported that the group was "beaten and robbed" in Mexico, on the other side of the Rio Grande River.  Once at the station, it was discovered that Andaverde had unlawfully entered the United States on prior occasions and had been deported.  His companions were permitted to return to Mexico without further legal proceedings, but he remained detained.  He was indicted and prosecuted for illegally reentering the United States following a prior deportation in violation of 8 U.S.C. § 1326.  At trial, Andaverde stipulated to all elements of the offense, admitting that he had in fact previously entered the United States unlawfully and been deported, but he maintained, pursuant to the defense of duress, that he was innocent of illegal reentry, contending

that he did not enter into the United States under his own volition this time, but rather under threat of force.  Testifying in his own defense, he told the jury that, while driving on a road in Mexico near the Rio Grande River, he and his companions were robbed at gunpoint.  The robbers, he testified, took their car and money and ordered them to swim across the river, threatening to start firing if they did not.  Andaverde and his companions followed the orders and swam across the river while the robbers escaped with their property.  Some time after reaching the other side and entering the United States, the group was found and arrested in the field.  Because Andaverde stipulated to all elements of the illegal reentry offense, the only issue for the jury to decide was whether to believe his story about entering the United States under duress.  If the jury believed Andaverde's story, it would have to acquit.  If the jury did not, it would have to convict.

## B.

As the majority explains persuasively, the government committed multiple violations of *Doyle v. Ohio*, 426 U.S. 610 (1976), during the course of Andaverde's short trial.  The *Doyle* rule is simple and should be understood by all prosecutors: once the government, acting through an arresting officer, informs an arrestee that he has the right to remain silent—*see Miranda v. Arizona*, 384 U.S. 436 (1966)—the government may not then at the criminal trial argue to the jury that the defendant's post-arrest silence is suspicious and good reason to disbelieve the story he offers at trial but did not tell the arresting officers.  *Doyle*, 426 U.S. at 619-20.  "Because it is fundamentally unfair simultaneously to afford a suspect a constitutional right to silence following arrest and yet allow the implications of that silence to be used against him, prosecutorial comment on silence for either substantive or impeachment value is constitutionally prohibited." *United States v. Shaw*, 701 F.2d 367, 381

No. 12-40472 c/w No. 12-40477

(5th Cir. 1983) (internal quotation marks omitted); *see also United States v. Harp*, 536 F.2d 601, 603 (5th Cir. 1976) ("[I]t is fundamentally unfair to allow an arrested person's silence following *Miranda* warnings to be used to impeach an explanation subsequently offered at trial.").

But that is what happened here. In flagrant disregard of *Doyle*'s clear and longstanding command, the government argued to the jury again and again that Andaverde's story about being robbed in Mexico and forced to cross the river at gunpoint should be disbelieved because he failed to announce it immediately after he was arrested, instead exercising his right to remain silent. In essence, the government urged the jury to convict Andaverde for exercising a constitutional right, and that unlawful strategy deprived him of the due process the Constitution requires. *See Wainwright v. Greenfield*, 474 U.S. 284, 291 (1986) ("*Doyle* and subsequent cases have thus made clear that breaching the implied assurance of the *Miranda* warnings is an affront to the fundamental fairness that the Due Process Clause requires.").

As explained by the majority, the government's unlawful trial strategy began during Andaverde's testimony in his defense in which he explained how he, allegedly, entered into the United States under duress, was found in the empty field, and was read his *Miranda* rights then, at the time of arrest.[1] On cross-examination, the government elicited from Andaverde two admissions

---

[1] The government attempts to challenge in this appeal the fact that Andaverde was read his *Miranda* rights at the time he was arrested, but as the majority explains persuasively, the government's arguments must fail. The government itself elicited from Andaverde on cross-examination the fact that he was read his rights in the field—at the time of arrest—and the government never attempted at trial to show anything otherwise. The government cannot now disclaim the evidence it presented at trial merely because it is displeased with the consequences of that evidence.

No. 12-40472 c/w No. 12-40477

that, after being arrested and read his *Miranda* rights, he remained silent at that time and during the ride to the station:

> Q:    At no point did you ever tell any of the agents that you had been robbed on the other side, did you, up until the point that you were at the Border Patrol station like you're saying?
>
> A:    That's right, until I was at the Immigration office.

To make sure the jury did not miss the government's point, the prosecutor asked for more:

> Q:    And when they found you in the field, you didn't go running to them at all saying, "Oh help. I need your help.  Someone on the other side wants to get me," did you?
>
> A:    No.

And with that, the government had found its theme for the remainder of the trial.  During the government's closing statement, the prosecutor hammered on the point repeatedly.  *First*:

> When they saw the lights of the Border Patrol vehicles, they laid down and hid.  They didn't run up to them and say, "Thank God you're here.  We needed some help. We got robbed."  No, they hid.  When the agents shined their flashlights on them, they ran.
>
> So what did the defendant do after he actually got caught here and put in the Border Patrol vehicle?  He starts joking with the agent.[2] *He doesn't say anything about the alleged robbery*.

(Emphasis added.)  *Second*:

---

[2] Despite this statement about Andaverde "joking" with the agent during the ride, there was no evidence of such presented at trial.  We have no indication why the prosecutor told the jury that Andaverde was "joking" during the ride.

28

No. 12-40472 c/w No. 12-40477

> One of the other aliens that was in the vehicle, he took the opportunity to make some sort of claim of a robbery. Didn't say when or where really, but he made a claim. *The defendant was right there. He said nothing.*

(Emphasis added.) *Third*:

> He gets back to the station. . . . He's given the opportunity later to say anything else he wanted to say and make a claim of any—that he was a victim of some sort of violence. *He said nothing.*

(Emphasis added). And, *fourth*:

> At least one of the other aliens did. They took the opportunity to make the claim again at the station. . . . *The defendant didn't even make the claim.*

(Emphasis added.)[3] After the government finished, Andaverde's attorney gave the defense's closing statement. Then, the government provided a brief rebuttal in which the prosecutor—again—returned to the silence. *Fifth*:

> Two Border Patrol agents were dispatched out to the scene, and when they were dispatched out to the scene, the defendant hid. They arrested him. They put him in the back of their vehicle, and *he never once said anything to them about being forced.* That was another person. It was another person who's not on trial here today.

(Emphasis added). Once that summary was over, the trial concluded and the jury's deliberations began.

---

[3] Andaverde does not contend in this appeal that the two references to his silence at the station (as opposed to during the ride to the station) constituted independent *Doyle* violations. Regardless, they are relevant context to show the extent to which the government hammered on the entirety of the defendant's post-arrest silence, elevating it to *the* primary factor for the jury's consideration. Additionally, it bears mention that Andaverde testified that he did, contra the government's closing statement argument, explain his duress story at the station.

No. 12-40472 c/w No. 12-40477

## C.

The deliberations were close. A little over two hours in, the jury reported that it was evenly deadlocked, six jurors wanting to convict and six wanting to acquit. The court urged the jury to continue working to reach unanimity, and a short time later, the jury did. It rejected Andaverde's duress defense and found him guilty.

## II.

Despite the repeated and obvious nature of the government's *Doyle* violations, Andaverde's attorneys did not object at trial to any of them. Consequently, this court reviews for plain error. *See* FED. R. CRIM. P. 52(b). Under such review, we will reverse a conviction only for legal error that is "clear or obvious" (in other words, "plain") and affected the outcome of the district court proceedings (or put another way, affected the defendant's "substantial rights"). *United States v. Olano*, 507 U.S. 725, 732-37 (1993); *United States v. Escalante-Reyes*, 689 F.3d 415, 419 (5th Cir. 2012) (en banc).

If those requirements are met, this court "has the *discretion* to remedy the error—discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Escalante-Reyes*, 689 F.3d at 419 (alteration omitted). Our discretion to remedy plain error "should be employed in those circumstances in which a miscarriage of justice would otherwise result." *Olano*, 507 U.S. at 736 (internal quotation marks omitted); *see also Escalante-Reyes*, 689 F.3d at 425 (stating that, although "we do not view the fourth prong as automatic if the other three prongs are met," we "should," however, correct errors "in those circumstances in which a miscarriage of justice would otherwise result") (internal quotation marks omitted).

30

No. 12-40472 c/w No. 12-40477

Here, the majority holds that the *Doyle* errors in this case were plain and affected the outcome of the trial, and I agree.  The remaining question is whether we ought to exercise our discretion to remedy the errors.  I think we ought to.

**A.**

The majority states that there is no "exact test" for determining how this court should exercise its discretion.  *Ante*, at 19.  That is undoubtedly true.  But it is also true that our case law provides ample guidance, and for the reasons that follow, fealty to our prior decisions demands that we provide a new trial. *See Martin v. Franklin Capital Corp.*, 546 U.S. 132, 139 (2005) ("Discretion is not whim," and "like cases should be decided alike.").

Although a number of factors may affect the court's decision on whether to remedy plain error, a core determinant is the severity of the error.  *See Escalante-Reyes*, 689 F.3d at 423 ("The focus of plain error review should be whether the severity of the error's harm demands reversal . . . .") (internal quotation marks and alterations omitted); *see also id.* at 440 n.25 (Smith, J., dissenting) ("[T]he degree to which the second and third prongs have been met [may] influence[] a fourth-prong analysis.  There may be a case in which, for example, an error that is particularly obvious to the district judge and affects substantial rights to a great degree is thereby likely to meet the fourth prong.").[4]  And, the *Doyle* violations here were severe for several reasons.

First, there is the obviousness of the violations.  *Doyle* prohibits the government from asking the jury to infer guilt directly from post-arrest silence, and that is precisely what the government did repeatedly in an open and

---

[4] This is not to imply that plain errors should be corrected *only* in those cases in which the errors were particularly "severe."  Depending on the context, a number of factors other than severity of the error may be relevant.

obvious manner. There was nothing subtle about what the prosecutor was suggesting to the jury when he said, for example, that, "[o]ne of the *other aliens* that was in the vehicle, *he* took the opportunity to make some sort of claim of robbery," but "*[t]he defendant* was right there" and "*[h]e said nothing.*" (Emphasis added.) This is not an instance where reasonable minds could differ on the government's intended meaning. The prosecutor here employed textbook *Doyle* violations to win a conviction. With less egregious *Doyle* violations, such as, for example, where the prosecutor merely mentions post-arrest silence in passing without pressing the matter, the court may have greater leeway to allow the conviction to stand. But obvious violations of this sort demand a remedy. *See United States v. Rodriguez*, 260 F.3d 416, 422 (5th Cir. 2001) (explaining that, when the prosecution "directly links" the defendant's post-arrest silence to the implausibility of his exculpatory story offered at trial, the government commits the most egregious sort of *Doyle* violation) (citing *Chapman v. United States*, 547 F.2d 1240, 1249-50) (5th Cir. 1977)).

Second, there is the pervasiveness of the violations. Not only did the government violate *Doyle* in an open and obvious manner, but it did so repeatedly. The *Doyle* violations began during Andaverde's cross-examination and they continued throughout closing statements and rebuttal. This pervasiveness affects the severity of the error and itself favors correction. *Compare United States v. Carter*, 953 F.2d 1449, 1467 (5th Cir. 1992) (declining to reverse for *Doyle* violation under plain-error review where "the prosecutor mentioned [the defendant's immediate post-arrest silence] only once very briefly in passing . . . and never emphasized it"), *with United States v. Meneses-Davila*, 580 F.2d 888, 895 (5th Cir. 1978) (reversing for *Doyle* violations under plain-error review where "[t]here was more than a single reference to

defendant's silence" and "[t]he repetition ensured that the prosecutor's point could not have been lost on the jury, for the trial lasted just one day").

Third, because of the unique circumstances of this case, the *Doyle* violations affected Andaverde's substantial rights to a great degree. The sole issue before the jury was whether to believe the story underlying Andaverde's duress defense, that he was robbed and forced to enter the United States against his will. Andaverde stipulated to the elements of the illegal reentry offense and he presented no affirmative defenses beside duress. Thus, the government's impermissible *Doyle* impeachment undercut the only issue for decision, whether Andaverde's story should be believed. That incredibly close nexus between the government's violations and the purpose of the trial both goes to the severity of the error and is itself cause for granting a new trial. *Compare Carter*, 953 F.2d at 1465 (declining to reverse for *Doyle* violations under plain-error review because, *inter alia*, "the story being impeached here is essentially peripheral to [the defendant's] defense"), *with United States v. Johnson*, 558 F.2d 1225, 1230 (5th Cir. 1977) (reversing for *Doyle* violations under plain-error review where the violations "went to the heart of the sole defense, encouraging the jury to believe that the defense was fabricated after arrest"), *and United States v. Harp*, 536 F.2d 601, 603 (5th Cir. 1976) (reversing for *Doyle* violations under plain-error review where "the prosecutor's comments struck at the jugular of the story").

If there is any doubt that the government's repeated *Doyle* violations were effective in hurting Andaverde's case, as they were intended to, that doubt should be dispelled by the fact that the jury deliberated for hours before reporting it was evenly deadlocked with six jurors wanting to convict and six wanting to acquit. *See United States v. Morales*, 854 F.2d 61, 64-65 (5th Cir. 1988) (Smith, J., dissenting) (contending that *Doyle* violations warranted

33

No. 12-40472 c/w No. 12-40477

reversal under plain-error review because the record showed the jurors having difficulty reaching unanimity).

The government's repeated *Doyle* violations in this case were obvious. The violations pervaded the short trial. And, the record shows that the jury was in all probability influenced by the government's unlawful and impermissible argument. The record shows, in short, that the government's *Doyle* violations were severe. We should not allow convictions obtained through such illegal means to stand. Under our precedent, such severe *Doyle* violations warrant a new trial even though the defendant's attorneys failed to lodge objections at the proper time. *See Meneses-Davila*, 580 F.2d at 895; *Johnson*, 558 F.2d at 1230; *Harp*, 536 F.2d at 603.

**B.**

The majority contends that four of our cases are "instructive" in illustrating why we should allow this unlawfully-obtained conviction to stand. *See ante*, at 19-20 (discussing *United States v. McCann*, 613 F.3d 486, 503 (5th Cir. 2010), *Escalante-Reyes*, 689 F.3d at 425-26, *United States v. Reyna*, 358 F.3d 344, 352-53 (5th Cir. 2004) (en banc), and *United States v. Seale*, 600 F.3d 473, 490 (5th Cir. 2010)).

Three of those cases—*McCann*, *Escalante-Reyes*, and *Reyna*—involve legal errors that occurred at sentencing and were caused by the district court's procedures. *See McCann*, 613 F.3d at 502 (court did not consider necessary documents in calculating sentence); *Escalante-Reyes*, 689 F.3d at 425-26 (court based sentence on impermissible consideration); *Reyna*, 358 F.3d at 352-53 (court did not allow defendant to speak during sentencing). It is not apparent—and the majority offers no affirmative explanation—what import those sentencing cases have here, where the government obtained a conviction from the jury through repeated, unlawful *Doyle* impeachment. I see no reason

34

*McCann*, *Escalante-Reyes*, or *Reyna* require or even suggest that this court should sit on its hands here.

*Seale*—the fourth case relied on by the majority—far from supporting the majority's decision to allow the unlawfully obtained conviction here to stand rather illustrates why we should require a new trial. *Seale*, like this case, involved the right of an arrestee to remain silent. The defendant there was arrested for murder at his home and transported by motor vehicle to the police station. During the ride, the arresting officers peppered the defendant with questions but they never read him his *Miranda* rights, *viz.*, that he had the right to remain silent. One of the officers told the defendant: "We know you did it, you know you did it, the Lord above knows you did it." That caused the defendant to respond, "Yes, but I'm not going to admit it, you are going to have to prove it." At the later criminal trial, the government presented the defendant's statement to the jury as evidence of his guilt. That was plain legal error, we held: because the arresting agents did not inform the defendant of his *Miranda* rights, the statement obtained from him during interrogation while he was in custody should have been excluded from evidence as inadmissible. However, we declined to use our discretion to remedy the error because we concluded that the erroneous admission of the statement "did not result in a manifest miscarriage of justice," explaining that, "we are satisfied that the Government presented a strong case of guilt. While the defendant's statement may have been helpful to the Government, *it was certainly not the centerpiece of its case*." 600 F.3d at 490 (emphasis added).

This case stands in stark contrast. Here, the government's unlawful *Doyle* impeachment *was in fact the centerpiece of the government's case*. The government's closing statements that pound on Andaverde's silence *five times* can be read no other way. The prosecutor told the jury that, when Andaverde

35

was arrested and taken to the border patrol station by motor vehicle, during the ride, "*[h]e d[id]n't say anything about the alleged robbery.*" To further highlight his silence, the prosecutor then told the jury that one of the *other* persons arrested with Andaverde told the story of the group's innocence, but *Andaverde* did not: "*[He] was right there. He said nothing.*" Next, the prosecutor turned to after the ride, when Andaverde and the others arrived at the station. There, once again: "*He said nothing.*" And, again: "At least one of the other aliens" "took the opportunity to make the claim again at the station." But not the defendant: "*The defendant didn't even make the claim.*" In summing up the case for the jury, the prosecutor zeroed in on the silence one last time: "*[H]e never once said anything to them about being forced. That was another person. It was another person who's not on trial here today.*" No reasonable juror could have listened to these five references to Andaverde's post-arrest silence and thought the issue was anything but the centerpiece of the government's case. As already discussed, the sole issue for trial was whether Andaverde's story of entry into the United States under duress should be believed, and the government presented precious little evidence besides the impermissible *Doyle* impeachment on that issue.

In sum, *Seale* suggests that Andaverde should be afforded a new trial. Although this court declined to remedy the government's legal violations in *Seale* because the violations played a minor role in the trial as a whole and were "certainly not the centerpiece of [the government's] case," here, the government's violations permeated the trial and *were in fact* the centerpiece of the government's case. The majority has identified no case—and I believe there is none—in which this court (or indeed, any other) has tolerated such unlawfulness underlying a conviction.

## C.

Those four cases aside, the majority provides an additional reason for declining to correct the plain errors here: because Andaverde's counsel bears some of the fault for the trial's focus on his post-arrest silence. As the majority explains, the defense attorney's opening statements to the jury included the ambiguous statement that "*they*"—referring to Andaverde and the others with whom he was arrested—explained "their" duress story to the arresting agents, thereby arguably creating the false impression that *Andaverde himself*, as one of the persons included in the plural "they," had personally told the story at the time of his arrest. That ambiguous statement, the majority contends, "opened the door" for the government to clarify that, contra the misleading implication of Andaverde's attorney's opening statement, the defendant had actually not told his story at the time of arrest, but rather remained silent. *See generally Rodriguez*, 260 F.3d at 421 (explaining that, "when a defendant testifies at trial that he told his exculpatory story at the time of his arrest," then "the defendant's silence is admissible only for the limited purpose of rebutting the impression that the accused had actively cooperated with the police"). After that was clarified, however, the government did not stop. Instead, it repeatedly ran afoul of *Doyle*, hammering on the post-arrest silence again and again, calling on the jury to find Andaverde guilty because of the silence. The majority is correct that Andaverde's attorney bears the fault for initially "opening the door" to limited discussion of whether Andaverde had professed his innocence immediately at the time of arrest, as the attorney's opening statements arguably implied, or only later, at the station, as Andaverde clarified in his testimony. That, however, does not make the government's subsequent, repeated *Doyle* violations, in which the government went far beyond the permissible limit, any less egregious. *See id.* (explaining

that, when the defendant "opens the door" to allow post-arrest silence to be used for a "limited purpose," the government remains prohibited from going further and arguing that "the defendant's silence was inconsistent with his claim of innocence"); *United States v. Martinez-Larraga*, 517 F.3d 258, 268 (5th Cir. 2008) ("We, and other circuits, have continued to recognize this 'open the door' or 'reply' exception to *Doyle*, while likewise recognizing that it does not permit the prosecution to argue that the jury should infer the defendant's guilt directly from his post arrest silence.") (citations, internal quotation marks, and alterations omitted). And, under our precedent, it does not support the majority's decision to decline relief here.

In *United States v. Meneses-Davila*, this court addressed similar circumstances and concluded that, despite the defendant's attorney's conduct, we should afford a remedy. There, "the prosecutor made four separate, intentional references to defendant's post-arrest silence," and, "[i]n an apparent effort to reduce the impact of these comments by explaining that the defendant remained silent because he was advised he had a right to do so, defense counsel himself made three references to defendant's silence." 580 F.2d at 891. The defendant's trial attorney, apparently unaware of the *Doyle* rule, did not object to any of the government's comments and himself injected the defendant's silence into the case. On appeal, this court held that, because the government's repeated *Doyle* violations were severe and "[t]he repetition ensured that the prosecutor's point could not have been lost on the jury, for the trial lasted just one day," reversal was mandated. *Id.* at 895-96. We noted that some of the government's comments on the defendant's silence were arguably "defense invited" but we disclaimed that as a reason for allowing the conviction to stand, explaining that the government went beyond its permissible bounds, requiring us to remedy the violations. *Id.* ("Even

38

discounting the comments that might be claimed to be defense invited, however, the prosecutor's other references mandate reversal.").

*Meneses-Davila*, in short, stands for the principle that, where there are severe, repeated *Doyle* violations, as there were here, we should remedy the violations, even if the defendant's attorney bears some culpability for the attention on his post-arrest silence.   Andaverde's attorney's unfortunate performance did not give the government carte blanche to ignore the Constitution, as *Meneses-Davila* makes plain.

### III.

Although the majority elects to let Andaverde's unlawfully obtained conviction stand, it expresses ever so slight discomfort with the prosecutor's tactics in this case.  The majority warns, this court still "endorse[s] *Doyle* as strongly" as it ever has (as if we have any choice whether to "endorse" Supreme Court precedent), and this case, even though it results in a win for the government, somehow "highlights the risks for the prosecution if it chooses to comment on a defendant's silence after *Miranda* warnings."  *Ante*, at 21 & n.3.

Today is not the first time this court has adopted the role of the scold when it comes to the government disregarding *Doyle*.  When we were faced with *Doyle* violations several decades ago, we took that opportunity to say, "we note that comment upon silence of the accused is a crooked knife and one likely to turn in the prosecutor's hand" and "[w]e suggest that it be abandoned as a prosecutorial technique."  *United States v. Edwards*, 576 F.2d 1152, 1155 (5th Cir. 1978).  But we went further then—we concluded that, because the government had abused the trial process, the defendant's conviction could not stand and the defendant deserved a new, lawful trial.  *Id.*  We were then, and we are today, a court of law tasked with enforcing constitutional rights and when faced with convictions obtained through plain violations of the

Constitution, we must carry out our duty. Although the legal landscape has evolved in the past decades, no decision of the Supreme Court's or ours since has instructed us to remain passive when faced with convictions obtained through the government's obvious, severe, and pervasive violations of constitutional right. By choosing to do so here, the majority brushes aside our precedent demanding otherwise and disregards the "basic principle of justice" that "[d]iscretion is not whim" and "like cases should be decided alike." *See Martin*, 546 U.S. at 139.

In order to convince the jury of Andaverde's guilt, the government adopted an illegal trial strategy of impeaching him for exercising his right to remain silent, and the strategy worked: the jury found Andaverde's exercise of his constitutional right suspicious, and he now remains in prison today. The government's conduct was "an affront to the fundamental fairness that the Due Process Clause requires." *Wainwright*, 474 U.S. at 291. We should require a new trial in which the jury can decide Andaverde's guilt or innocence free from undue and unconstitutional *Doyle* influence.

I respectfully dissent.